**Cyril H. WECHT et al.,**

v.

**Richard MARSTELLER et al.**

Civ. A. No. 73–667.

United States District Court,
W. D. Pennsylvania.

Sept. 20, 1973.

Stanley Stein, Pittsburgh, Pa., for plaintiffs.

Daniel Curtin, Asst. City Sol., Pittsburgh, Pa., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND PRELIMINARY INJUNCTION

SNYDER, District Judge.

The named individuals brought an action for injunctive relief under the Civil Rights Act, 42 U.S.C. Section 1983, on behalf of themselves and on behalf of all persons who now, have in the past, or will in the future, travel upon the public roads, sidewalks and highways of the City of Pittsburgh, to enjoin Richard Marsteller,[1] an employed full-time Police Officer of the Traffic Division of the Police Department of the City of Pittsburgh, from continuing alleged deprivations, occurring under color of state law, of rights, privileges and immunities guaranteed by the Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States.

Prior to the hearing, the defendant filed an answer to the complaint asserting that the Court lacked jurisdiction

---

1. Subsequent to the filing of the request for preliminary injunction, an amended complaint was filed, the caption of which appears herein. Counsel for both parties agreed that the hearing on the preliminary injunction was solely on the original complaint as filed which was "Cyril H. Wecht, Robert Barron, Ricardo Butler, Robert Dillard and Samuel Zimmerman, individually, and on behalf of all others similarly situated vs. Richard Marsteller".

for the reason that the actions alleged to have been done by the defendant did not amount to a deprivation of the plaintiffs' civil rights within the cognizance of 42 U.S.C. Section 1983 but, rather, that at all times the defendant was acting lawfully and within the course of his employment as a Police Officer of the City of Pittsburgh. In addition, it was alleged that this proceeding was inappropriate for a class action and that the plaintiffs had an adequate remedy at law. The defendant further denied all the factual allegations in the complaint.

At the hearing, the plaintiffs[2] produced substantial testimony relating to numerous incidents in which the defendant police officer was involved.

The Court's Findings of Fact are set forth below. The record in this case establishes that the particular officer involved has been guilty of such violations and with such frequency that they cannot be dismissed as simply isolated instances of intemperance; nor is it apparent that there is any existing remedy which has been adequate to protect the public interests involved; suits for damages are not successful, as well as being expensive, and do not seem to have preventative effect. While one must have respect and admiration for the performance of numerous police officers, this does not blunt the sensitivity of the Court in those particular instances, such as in this case, where there is a pattern of violation of those rights which the Constitution has so carefully preserved.

We have given very careful evaluation to the particular interests and emotional involvement of the witnesses, and we have given full benefit of the presumption that police officers act properly. We make the following Findings of Fact.

## I. FINDINGS OF FACT

### a) CYRIL WECHT INCIDENT

On October 7, 1972, Cyril H. Wecht with his three boys, together with a neighbor, Vigdor Kavaler, and his boys, attended the Pittsburgh Pirates-Cincinatti Reds baseball game at Three Rivers Stadium on Pittsburgh's North Side. By prearranged plans Wecht was to be picked up after the game directly opposite Gate D of the Stadium on Allegheny Avenue, where he had been picked up before. Upon coming out from the game and waiting for a period of time, Wecht observed that no cars were coming down Allegheny Avenue. He then proceeded to the intersection of Allegheny Avenue and Northshore Drive where he discovered there was a Pittsburgh Police Cruiser and Motorcycle parked in such fashion as to block traffic coming from Northshore Drive onto Allegheny Avenue in the direction that Wecht would expect his vehicle to have been approaching. At the far end of the cruiser was the defendant police officer, Richard Marsteller, who was then engaged in blocking vehicles going into Allegheny Avenue in accordance with directions given to him by his superiors.

While there is some dispute in the testimony at this point, it is apparent that when Wecht came within about fifteen feet of the police officer they became involved in a discussion as to the necessity of blocking off that particular street. When Wecht asked the officer how anyone could get into Allegheny Avenue to pick up persons waiting for rides, the officer's answer was given in a rather rude and exasperated manner. The discussion became more heated and the officer finally said that if Wecht did not get out of the area he would be arrested. This irritated Wecht sufficiently that, perhaps not in the best of judgment but still clearly within his rights, he insisted upon staying at the corner to wait for his ride. Again he was warned that if he did not get out of the area he would be arrested and, at this point, when Wecht refused to leave, the officer placed him under physical arrest by grabbing him on the left arm and then grabbing him in such a way that he held

---

2. Ricardo Butler and Samuel Zimmerman were dropped as named plaintiffs.

the plaintiff's sport jacket and twisted it so as to compress the plaintiff's neck. Marsteller then dragged Wecht to the police cruiser and pushed him up against the rear of the vehicle causing Wecht to take protective action not to strike his face against the cruiser. Without releasing the plaintiff's shirt and neck, the officer continued to press Wecht to move over to the motorcycle where a call was made over the police radio and a police van soon arrived.

At no time during the incident, while the plaintiff may have raised his voice, did he offer resistance of any kind to the defendant or threaten any type of physical bodily injury or in any way interfere with the police officer's performance of his duty, or obstruct the police officer in any manner. After the van arrived, Wecht was ordered into the van and driven to No. 9 Police Precinct, where he was required to fill out certain forms. He was then taken to the Pittsburgh Public Safety Building where he was placed in a cell and caused to remain there for approximately two hours.

Officer Marsteller admitted that he had ordered Wecht out of the area because he maintained that Wecht was interfering with his function as a Traffic Policeman at that time. Assuming all of this to be true, there is no explanation by the officer as to the necessity for the use of physical force at the time of the arrest, nor was there any substantiating testimony for the requirement for the use of any such force.

Henry Novak, a parking attendant, witnessed most of the confrontation between Wecht and Marsteller and while he substantiated the officer's testimony with respect to the fact that undoubtedly the discussion was an annoyance in the officer's performance of duty, he also testified that Wecht never became boisterous or loud which would have indicated any necessity for the use of force in making the arrest.

Officer Alfred Kutschbach, who was also involved in the Wecht Incident by reason of the fact that he came to the

assistance of Officer Marsteller, said that Wecht at one point put his hands on his (Kutschbach's) lapels but when he told Wecht to put his hands down he immediately dropped his hands. There was nothing in Kutschbach's testimony to indicate the necessity for the use of force, nor was there any reason whatsoever for requiring the removal of Wecht from the area.

It is noted, solely for the completeness of the record here, that the defendant police officer brought charges against the plaintiff for Disorderly Conduct, Assault and Battery, Resisting Arrest, and Interfering with a Police Office. All of these charges were subsequently dropped, as well as a charge brought by Wecht against Officer Marsteller.

Under all of the evidence we can find no possible cause for the force used in the arrest of Cyril Wecht nor, certainly, was he guilty of any disorderly conduct since he was making minimal efforts to protest what were clearly the violations of his rights.

One of the aggravating factors in the situation as it developed was the fact that Wecht called for assistance from his friend, Vigdor Kavaler, who had been some distance away but who came into the immediate area when summoned by Wecht. Apparently, from this action, Officer Marsteller took it that Wecht was trying to get some witnesses against him which, of course, he was. The testimony of Mr. Kavaler clearly substantiates the version of the incident as we have given it above, showing that there was no basis whatsoever for the manhandling of Cyril Wecht and, certainly, that his conduct was not in any way that of a person guilty of disorderly conduct or of attempting to interfere with the operations of a police officer.

### b) ROBERT BARRON INCIDENT

In June of 1972, Robert E. Barron together with his wife and some other relatives went to an Arby's Restaurant located on Forbes Avenue in the Oakland Section of the City of Pittsburgh. When he entered the premises he saw

Marsteller, off duty and in civilian clothes, leaning against the counter in such a way that it was difficult to determine whether or not he was actually in line to order food. Barron approached Marsteller and asked if he was in line. Marsteller apparently got the impression that Barron was trying to get ahead of him and there ensued a very loud verbal confrontation. The testimony of two completely disinterested witnesses indicates that the conversation became louder and louder until finally Barron made some comment to the effect that he would call the police. Marsteller responded that it would not be necessary to call the police because he was a policeman, and that Barron was under arrest and should not leave the premises. To this point there had been no physical contact between the two, nor had Barron been guilty of any attempt to do anything other than argue with Marsteller. Marsteller left the premises and as far as to this incident there is indicated at the most, perhaps both parties had been guilty of some rather rude and offensive conduct as to the other people in the restaurant but, certainly, falling far short of disorderly conduct. Further, when Marsteller left the incident was concluded.

In a very few minutes, however, Marsteller returned accompanied by two policemen. Outside the restaurant, at least three police vehicles appeared at the same time. Marsteller announced to Barron that he was under arrest and attempted to have him handcuffed by the officers who accompanied him. Barron was taken from the restaurant and spread eagled over the hood of one of the police vehicles. It was testified that despite the protests of Barron's wife, Marsteller took a billy club from the holster of one of the police officers and struck Barron over the back of the neck and head, at least one of the blows being struck from a full upraised position of the arm and club. Barron was then taken to a Police Precinct and there charges of Assault and Battery, Assault with Intent to Maim (based upon a bit-

ing of the police officer's finger), Resisting Arrest and Disorderly Conduct were lodged.

We must conclude under all of the evidence that there was no probable cause whatsoever to have arrested Robert Barron and that his arrest was completely illegal.

This particular incident, as noted above, was witnessed by Marjorie Pollock and Mark Pollock, both of whom impressed this Court as being completely disinterested. The testimony given by the Pollocks substantiated fully the factual conclusion that if anything occurred at Arby's it was that the police officers' conduct was without any justification. The substance of their testimony was that they could not believe that two grown men could get into a verbal confrontation such as had occurred and then that one of the two men would be arrested. Mr. Pollock, in fact, said that as he observed the arrest he felt "it was a complete distortion at this point". He stated that at no time did Barron resist the police officers. Furthermore, he testified that Marsteller had told Barron's brother-in-law that if he did not like what was going on, he would arrest him too. This arrest, of course, did not occur. Mr. Pollock and Mrs. Pollock both testified to the beating of Barron while he was being held by the two on-duty police officers.

Officer Marsteller indicated only that Barron had become very loud and abusive and when he told him to shut up, he refused to do so. It was at this point, since there were other people in the area, that Marsteller concluded it was necessary to make an arrest. According to his version he told Barron to stay where he was and then he went out and called for help. Officers Longmore and Newman came in response to his summons. Their testimony, together with that of Marsteller, is that when they attempted to take Barron off to the vehicles there was a violent scuffle and resistance, and Barron tried to grab the club of one of the officers. He managed to get hold of the handle and it is at this

point that it became necessary for Marsteller to get into the affray, break Barron's hold on the club and in doing so, he may have possibly hit Barron with the club. In this regard, Officer Marsteller made a very interesting observation. He said he didn't remember hitting the man but "if I would have hit him, he would have been severely injured". The Court was very careful in noting the attitude of Officer Marsteller throughout the trial. His disdainful reaction to all of the testimony given by the plaintiffs and their witnesses, and coupled with remarks such as the above, indicates to this Court that the testimony of the plaintiffs and their witnesses was to be believed.

### c) ROBERT DILLARD INCIDENT

In August of 1972, Robert Dillard was driving a GMC panel truck in a westerly direction along Fifth Avenue near Bigelow Boulevard in the Oakland Section of the City of Pittsburgh. The truck driver apparently made the mistake of passing a police motorcycle being operated by Officer Marsteller, although doing so in a careful manner. Whereupon, the officer chased and caught up with the truck and pulled it over to the curb at the approximate location of the Montefiore Hospital. Dillard says that he complied with the officer's direction to show his registration card, while at the same time protesting that he did not know why he was being stopped. Marsteller immediately called for a police wagon and ordered Dillard from his truck. Dillard testified that it was at this point that Marsteller grabbed him by the throat slamming him against the police wagon as it arrived on the scene. As the police officers left the wagon, Marsteller, while holding Dillard by pinning his arms back, punched him in the stomach and chest.

Marsteller says in substance that Dillard refused to exhibit his driver's license and owner's card and that is the reason that it was necessary to get him out of the vehicle. Officer John Sitarik, who assisted in this matter, testified that when he was informed that Dillard was stopped for a vehicle violation for failure to show his identification, he didn't even ask him for his identification cards but simply ordered Dillard out of the vehicle. Both officers denied any mistreatment of Dillard. Again, we must conclude that excessive force was used.

### d) MICHAEL WEINER INCIDENT

In this situation we are faced with the rather unusual circumstance of the person who was arrested not being available to give testimony. A Doctor Leinhardt, Professor of Sociology at Carnegie Mellon University, testified about an incident that occurred on September 26, 1970, at the corner of Murray and Phillips Avenue in the City of Pittsburgh. Dr. Leinhardt was following a car, later identified as being driven by Michael Weiner, when he saw the vehicle stop near the curb and a police officer come riding up on his motorcycle. He saw the officer go over to the Weiner car, an open convertible, and the officer pulled the driver out of the car by his hair. He then saw the officer striking the man and observed that his glasses were in complete disarray and that his face was bleeding. There were two young ladies in the car with Weiner and when he was taken away in the police van, Dr. Leinhardt took the young ladies to his home and then made sure that they got to their own homes properly. This incident was also witnessed by a Stephen Schacter, who happened to be standing on the corner of Murray and Phillips. He saw the convertible pull over to the curb and saw the police officer come riding up on the motorcycle. He testified that the police officer jumped off the motorcycle which careened up the street until it fell over. He saw the officer punch the driver in the face around the area of the eyes and cheekbones, then grab the driver by the hair and pull him over the door of the car and then held him on the ground. He testified that at no time did the driver make any offensive resistance of any kind, and that the driver appeared to be surprised by the

whole thing. The driver apparently kept asking the officer, "What did I do?" "What did I do?" Soon a police van came and Weiner was handcuffed and put into the van. In the meantime, a crowd had formed and seemed very puzzled as to what the whole matter was about. Schacter was not acquainted with any of the parties but was curious enough to go down to the police station where Weiner had been taken. He noted that Weiner was bleeding from the cheeks and that his glasses were broken. Schacter asked Weiner, at this point, what he had done and Weiner denied knowing what the whole thing was about. He testified that the officer was in a rage and called the driver some very vile names while holding him down awaiting the arrival of the police van. Weiner is described as being about five feet ten inches tall and weighing one hundred and thirty-five pounds. The Court observed that the officer was somewhat shorter in height but of a much more stocky build.

One of the passengers in the Weiner vehicle was Barbara Eichinger, twenty-one years of age, who had known Weiner for about five years. She stated that as far as she knew, Weiner was attending school. She described how they got off the Parkway at the Squirrel Hill exit and were attempting to make a U-turn when someone in the gas station, whom they did not recognize as a police officer, yelled at them. They continued on their way up the street and there is no evidence of unusual speed or of an attempt to get away from the scene. The next thing she observed was at the next intersection when the police officer came riding up on his motorcycle. She stated that the officer jumped off his motorcycle and pulled Weiner out of the car. The officer physically beat Weiner, who was on the ground, with his hands and fists right in the middle of the street, and when she last saw him he was bruised and bleeding.

The other passenger was Sheryl Sauer, who also testified that she heard a man yell "pull over" as they were mak-ing a U-turn, but there was no identification on him to indicate that he was a police officer and they thought it was simply someone who knew them. She testified that the officer grabbed Weiner by the hair and pulled him out of the car and onto the street. At that time Weiner said, "I didn't know you were a policeman" . . . . . "Stop!" . . . "Stop!" Her testimony is that the police officer beat Weiner for a short period of time during which he was making no resistance of any kind.

Officer Marsteller claims that while Weiner was making a U-turn at Murray Avenue, he was standing on the curb and was struck on the shin by the rear bumper of Weiner's car. He ordered Weiner to stop and when the car took off, he immediately got on his motorcycle and started after it. He testified that as the Weiner vehicle approached the intersection of Phillips and Murray it attempted to pass between a building and a pole. When there was not sufficient space for the car to get through, it stopped. It was at this point that he came running up to Weiner. He admits pulling Weiner out of the car but denies striking him at any time. In the light of the very strong and consistent testimony of the many witnesses for the plaintiffs, the defendant's version of this incident is very difficult to believe.

Based upon the above discussion, the Court makes the following Conclusions of Law.

## II. CONCLUSIONS OF LAW

■ 1. Local law enforcement officials who act under color of state law and who use excessive force or who make illegal arrests are subject to the equity powers of this Court under 42 U. S.C. Section 1983. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Lewis v. Kugler, 446 F.2d 1343 (3d Cir. 1971); Schnell v. City of Chicago, 407 F.2d 1084 (7th Cir. 1969); Lankford v. Gelston, 364 F.2d 197 (4th Cir. 1966); N.A.A.C.P. v. Thompson, 357 F.2d 831 (5th Cir. 1966); York v.

Story, 324 F.2d 450 (9th Cir. 1963); Hairston v. Hutzler, D.C., 334 F.Supp. 251, affirmed, 468 F.2d 621 (3d Cir. 1972).

2. That the defendant, Richard Marsteller, acting under color of state law, has engaged in a course of illegal and unconstitutional conduct by using wrongful and excessive physical force on numerous occasions, disclosing a pattern of conduct that has violated the constitutional rights of users of the sidewalks and streets of the City of Pittsburgh.

3. The actions of the defendant, Richard Marsteller, were directed against users of the streets and sidewalks of the City of Pittsburgh in the course of their use of the streets and sidewalks of the City of Pittsburgh.

■ 4. The deprivation of the constitutional rights of the plaintiffs and other users of the streets and sidewalks of the City of Pittsburgh constitutes irreparable harm for which they are entitled to equitable relief. Lewis v. Kugler, *supra;* Lankford v. Gelston, *supra;* Schnell v. The City of Chicago, *supra;* Gomez v. Layton, 129 U.S.App.D.C. 289, 394 F.2d 764 (1968).

5. Injunctive relief is essential to prevent the defendant from continuing to deprive the plaintiffs and other users of the streets and sidewalks of the City of Pittsburgh of their constitutional rights.

6. Plaintiffs do not have an adequate remedy at law.

■ 7. This is a valid class action under the provisions of Rule 23(b)(2) and (3).

■ 8. Taking into account the fact that deprivations of constitutional rights must be stopped promptly but that unnecessary encroachment upon state and local government functions must be avoided (Lewis v. Kugler, *supra*), it is necessary that injunctive relief be granted to the plaintiffs. This action is required to insure that the rights of the plaintiffs, which are subject to constitutional protection, will not be violated by the defendant in the future. Monroe v. Pape, *supra;* Hairston v. Hutzler, *supra;* Gomez v. Wilson, 323 F.Supp. 87, (D.D.C.1971).

■ 9. In civil rights matters under Section 1983, unappealed state convictions do not constitute collateral estoppel preventing the plaintiff from attacking the constitutional questions in the federal courts. Kaufman v. Moss, 420 F.2d 1270 (3d Cir. 1970) cert. denied, 400 U. S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970); Ney v. State of California, 439 F.2d 1285 (9th Cir. 1971); Mulligan v. Schlachter, 389 F.2d 231 (6th Cir. 1968); Moran v. Mitchell, 354 F.Supp. 86 (E.D.Va.1973).

10. It is clear with respect to the testimony as adduced in this case, that the unconstitutional conduct of the defendant, in violating the constitutional rights of the users of the streets and sidewalks of the City of Pittsburgh, may recur.

■ 11. On the basis of the evidence as presented in this case which shows a continued course of conduct on the part of the defendant, which course of conduct violated the constitutional rights of the plaintiffs and others using the streets and sidewalks of the City of Pittsburgh, it is the conclusion of this Court that a preliminary injunction must issue enjoining the defendant officer from:

(a) Stopping, arresting or imprisoning plaintiffs or other users of the streets and sidewalks of the City of Pittsburgh without adequate cause while they are conducting themselves in a lawful and proper manner;

(b) Physically manhandling or otherwise mistreating, users of the streets and sidewalks of the City of Pittsburgh while they are conducting themselves in a lawful and proper manner;

(c) Using wrongful or excessive force while bringing about lawful arrests, subduing, or otherwise handling the users of the streets and sidewalks of the City of Pittsburgh;

(d) Intimidating users of the streets and sidewalks of the City of Pittsburgh

and violating their constitutional rights of assembly, association and rights of equal protection; and

(e) Seizing or otherwise manhandling residents and users of the City of Pittsburgh in violation of their Fifth Amendment rights not to be deprived of liberty without due process of law.

An appropriate order will be issued.