**Bessie M. LEWIS, Plaintiff,**

v.

**DELAWARE STATE COLLEGE, Board of Trustees of Delaware State College, and Walton H. Simpson, William G. Dix, William H. Davis, James C. Hardcastle, Richard Barros, James H. Williams, Lee Kallos, Arthur Richardson, Helen Kirch, Individually and as the Board of Trustees of Delaware State College and Luna I. Mishoe, Individually, and as the President of Delaware State College, Defendants.**

Civ. A. No. 78–266.

United States District Court,
D. Delaware.

July 19, 1978.

---

Jacob Kreshtool, Sheldon N. Sandler and Thomas S. Neuberger, of Bader, Dorsey & Kreshtool, Wilmington, Del., for plaintiff.

Nicholas H. Rodriguez and William D. Fletcher, Jr., of Schmittinger & Rodriguez, P. A., Dover, Del., for defendants.

## OPINION

LATCHUM, Chief Judge.

■ The plaintiff, Bessie M. Lewis, instituted this action[1] to vindicate her federal constitutional rights which she claims were violated by the defendants when they refused to renew her contract of employment on July 1, 1978 as Director of Residence Halls For Women ("Director") at Delaware State College because she bore a child out of wedlock.[2] The matter is presently before the Court on plaintiff's motion for a preliminary injunction in which she seeks (1) to enjoin the defendants from filling the vacancy created by their failure to renew her contract, (2) to compel them to reinstate her as Director, and (3) to continue thereafter to allow her the same rights, privileges and immunities which were attached to her status prior to her termination.[3]

## FINDINGS OF FACT

A hearing was held on the motion on July 6, 1978 at which time the parties produced the testimony of witnesses and introduced documentary evidence.[4] The Court now having carefully considered and weighed the witnesses' testimony, their demeanor on the stand, and having further considered

1. Jurisdiction exists by virtue of 28 U.S.C. §§ 1331 and 1343(3), (4) as the case arises under the Constitution and laws of the United States and the amount in controversy exceeds $10,000 exclusive of interest and costs.

2. Docket Item 1.

3. Docket Item 2. Although the parties have not addressed the question whether the Eleventh Amendment may be a defense to the relief sought by the plaintiff, such a defense sufficiently partakes of a jurisdictional bar as to merit consideration at the outset.

 Recent Supreme Court decisions and numerous federal circuit court cases indicate that injunctive decrees which are addressed to public officials engaged in unconstitutional state action and which are "prospective in nature" do not run afoul of the doctrine of Eleventh Amendment immunity. E. g., *Edelman v. Jordan*, 415 U.S. 651, 662–69, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *see Fanty v. Pennsylvania Dept. of Public Welfare*, 551 F.2d 2, 4–5 (C.A.3, 1977); *Skehan v. Board of Trustees of Bloomsburg State College*, 501 F.2d 31, 43 (C.A.3, 1974), *vacated and remanded on other grounds* 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975); *Akron Board of Education v. State Board of Education of Ohio*, 490 F.2d 1285, 1292 (C.A.6) *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *Safeguard Mutual Ins. Co. v. Miller*, 472 F.2d 732 (C.A.3, 1973); *Williams v. Eaton*, 443 F.2d 472 (C.A.10, 1971); *Carter v. Gallagher*, 452 F.2d 315, 322 (C.A.8, 1971) *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); *Board of Trustees of Arkansas A. & M. College v. Davis*, 396 F.2d 730, 732–33 (C.A.8) *cert. denied*, 393 U.S. 962, 89 S.Ct. 401, 21 L.Ed.2d 375 (1968). In this case, the Court is presently asked only to grant prospective equitable relief in the form of restraining the individual defendants from filling the vacancy created by plaintiff's termination and reinstating her to the position she held prior to her termination. *See Skehan v. Board of Trustees of Bloomsburg State College, supra.* Although an award of such relief may, as a necessary consequence of compliance in the future, require the expenditure of state funds, such an "ancillary effect," as *Edelman v. Jordan* noted, is not precluded by the Eleventh Amendment. 415 U.S. at 667–68, 94 S.Ct. 1347. The Court thus concludes as a matter of law that the College and the individual defendants in their official capacities are not shielded by Eleventh Amendment immunity with respect to the limited injunctive relief sought by the plaintiff. Whether Eleventh Amendment immunity may be successfully asserted as a defense to any claim for damages, backpay or attorneys' fees against the college or the individual defendants in their official capacities is an issue the Court need not reach today. *See Edelman v. Jordan, supra.*

4. Docket Item 13 (Transcript of testimony, "Tr.").

the memoranda of the parties[5] and oral arguments of counsel,[6] finds the pertinent facts to be as follows:

The plaintiff was first employed by the College in September, 1969, as an Assistant Director of Laws Hall, one of three college dormitories for women.[7] In October, 1969, she was named Acting Director of Residence Halls for Women and was appointed full time Director on July 1, 1972, having the oversight of all three women's residences at the College; she served in that capacity under renewed one-year contracts, running from July 1 through June 30, until July 1, 1978.[8] During the time plaintiff was employed as Director she was evaluated in the performance of her duties on an annual basis and on each occasion was determined to be performing satisfactorily.[9]

Under the personnel policies and practices of the College, the plaintiff's position as Director was classified as part of the non-academic professional staff.[10] The College's professional staff enter into annual contracts which run from July 1 through June 30 and are generally offered around the first of April of each year.[11] The personnel manual referring to terminations of professional staff members provides, in pertinent part, as follows:[12]

"After having served an initial 90-day probationary period of employment, employees shall only be terminated for cause, except in cases where positions supported by a grant are not funded or a position is no longer determined essential by the Administrative Council and is eliminated. Employees terminated for reasons other than cause will be given priority for any vacant position at the College for which they qualify."

Thus, despite the fact that professional staff members serve under annual contracts, the College personnel policy quoted above implicitly creates for the employee an expectancy of contract renewal if the employee receives a satisfactory job evaluation report for the current year and the job, if supported by grants, continues to be funded and is not otherwise abolished.[13]

Plaintiff, a single woman, first learned that she was pregnant in August, 1977, at which time she consulted her physician.[14] Plaintiff wanted the child and was advised by the physician that, because of her past history and age, if she were going to bear a child now would be the time.[15] Although she considered an abortion, she decided that she wanted the child and would go through with the pregnancy.[16]

The pregnancy resulted from a private and intimate relationship which began in August, 1976, between the plaintiff and Charles E. Henderson, Jr., the assistant football coach and assistant director of the student center at the College.[17] Henderson has acknowledged paternity of the child both to the plaintiff and to the Family Court and is now paying the plaintiff child support.[18]

On February 1, 1978, plaintiff wrote to Dr. William R. Wynder, her immediate superior and Vice-President for Student Affairs, requesting a maternity leave from March 1 until June 16, 1978.[19] Dr. Wynder initially approved the maternity leave and requested the approval of Dr. Luna I. Mish-

5. Docket Items 6 and 14.

6. Oral argument of counsel was heard on July 13, 1978.

7. Tr. 100.

8. Tr. 100–04; DX 3, 7 & PX 16.

9. DX 4, p. 5; Tr. 83, 88, 122–23; PX 14.

10. DX 4, Forward; Tr. 67–68.

11. Tr. 71.

12. PX 6, p. 17.

13. Tr. 65–66, 88, 92, 94–95, 123–24, 166–69.

14. Tr. 119.

15. Id.

16. Tr. 120.

17. Tr. 98, 117.

18. Tr. 98, 154–55; PX 11.

19. PX 5; Tr. 16–17, 164–66.

oe, the College President, on February 17, 1978; Dr. Mishoe approved the leave on February 20, 1978.[20]

On February 28, 1978, Dr. Wynder completed an evaluation report of plaintiff's current performance, found her performance as Director to be satisfactory, recommended that she be retained for another year of employment and considered her eligible for a normal annual salary adjustment.[21].

Believing her contract was assured for another year, plaintiff commenced her 75-day maternity leave on March 1, 1978.[22] Plaintiff's child was born on March 12, 1978.[23] However, when the plaintiff did not receive her renewal contract for the '78–'79 school year as expected in the beginning of April, she called Dr. Wynder on April 7, 1978, to inquire about it.[24] Dr. Wynder seemed surprised that the contract had not been received and suggested to the plaintiff that she call Mrs. Harris in Dr. Mishoe's office.[25] Upon telephoning Mrs. Harris, plaintiff was referred to Dr. Mishoe who for the first time stated that he had decided to recommend to the College's Board of Trustees that her contract not be renewed.[26] Dr. Mishoe met with the plaintiff, at her request, later that day and explained that he had decided to reject Dr. Wynder's recommendation of reemployment and to recommend that the plaintiff's contract not be renewed based on the fact that she had given birth to a child out of wedlock.[27] The plaintiff also requested to see the Board of Trustees and on April 13, 1978, she met with the Student Affairs Committee of the Board. The members of the committee agreed to Dr. Mishoe's recommendation that the plaintiff's contract as Director not be renewed but decided that she should be given a job in some other capacity.[28]

As a consequence of these meetings, plaintiff's contract as Director of Residence Halls for Women was not renewed but she was offered and accepted under protest a contract for a newly created position as a Financial Aid Counselor at a salary $5,867.00 less than she would have earned as Director for the 1978–79 school year.[29]

Dr. Mishoe testified that one of the reasons the plaintiff was not rehired as Director was because she failed to satisfy the requirement set forth in her job description that she be "of good moral character." [30] The evidence shows that prior to the birth of her son the plaintiff had never seen a job description for the position of Director.[31] Indeed, the only job description for that position which the defendants have been able to produce was drafted in April, 1978—the month the plaintiff was informed she would not be rehired as Director.[32] Nevertheless, the Court finds that the plaintiff did realize that she had to be of good moral character to maintain her job. That requirement was included in the job descriptions of the Residence Hall Directors and their assistants who were subject to plaintiff's supervision, and she testified that she understood it to apply to herself as well.[33]

However, the evidence clearly indicates that the plaintiff did not believe that having a child out of wedlock could be considered cause for terminating her as Director.[34] Nor did she have any reason to

20.  *Id.*

21.  PX 14; Tr. 122–24.

22.  Tr. 121, 124, 165–66.

23.  Tr. 97.

24.  Tr. 125.

25.  Tr. 125–26.

26.  Tr. 126.

27.  Tr. 127, 19–22.

28.  Tr. 25–27, 75–76.

29.  DX 5; Tr. 72–74, 134.

30.  Tr. 43–44.

31.  Tr. 162–63.

32.  PX 9.

33.  PX 12, 13; Tr. 160–63.

34.  Tr. 120, 128, 133.

think otherwise. First, besides the requirement of "good moral character," no written notice appeared in any College policy that bearing an illegitimate child would be cause for termination.[35] Second, the plaintiff knew five other professional staff employees who had illegitimate children either before being employed or during their employment with the College none of whom were refused employment or terminated or even criticized by the College.[36] Third, plaintiff knew that during the time she had been employed at the College many female students had become pregnant without being married and no action had been taken against them.[37]

Dr. Mishoe testified repeatedly that the sole reason[38] plaintiff's contract was not renewed was because she gave birth to an illegitimate child, and that he believed this violated the College's unwritten moral standards, particularly for a person in the Director's position whose job it was to counsel female students.[39] Dr. Mishoe also believed that retaining plaintiff as Director would cause a storm of protest from taxpayers and parents if they learned that she had a child born out of wedlock and that the situation might affect future student enrollment.[40] Dr. Mishoe testified that one of the responsibilities of the Director was to counsel students on personal and/or social problems relating to residential living. He based this statement on the April, 1978 job description of the Director's position,[41] but the Court is convinced that that description is inaccurate. The plaintiff testified that

her job called for very little, if any, personal counseling and that those discussions that she did have with students were problem-solving sessions relating to student housing and roommate problems.[42] Plaintiff further testified that students obtain counseling for personal and private problems from the Counseling Service Department or Health Services Department of the College[43] and this testimony is corroborated by the Student Handbook which states that all "personal, social, and academic counseling is provided by the Counseling Service" whose office is open from 8:30 a. m. to 4:30 p. m. Monday through Friday and that Counselors are available after hours by appointment.[44] Therefore, the Court finds that, at least in the past, the position of Director has not involved personal counseling of students.

■ Finally, the Court finds that the conduct of the defendants in this case constituted state action within the meaning of the Fourteenth Amendment. Delaware State College is a creature of the Delaware General Assembly having been established in 1891 under the Morrill Act of 1890.[45] Its affairs are conducted by an eleven member Board of Trustees, a majority of six of whom are appointed by the Governor of the State and the remaining five are appointed by the Board as a whole.[46] The Governor is an ex officio member of the Board. The College is not only tax exempt but receives between 60 and 70 percent of its operating and debt service funds from state tax reve-

35. Tr. 28–29, 32, 35–36, 39.

36. Tr. 112–16, 151–55. One of the employees was the College librarian, one the assistant football coach and assistant director of the Student Center and the three others (one man and two women) were Residence Hall Directors.

37. Tr. 36, 47–48, 116–17, 149.

38. Dr. Mishoe clearly stated that plaintiff's termination had nothing to do with her job performance (Tr. 22), had nothing to do with the moral standards of the community (Tr. 28), and had nothing to do with engaging in premarital sex (Tr. 39, 42). He also testified that the Director's job was not abolished (Tr. 92).

39. Tr. 22, 28, 29–30, 39–44, 50–51, 76–78, 80–82, 85–87.

40. Tr. 40, 78.

41. PX 9.

42. Tr. 102–05, 107–12.

43. Tr. 105–06.

44. PX 8, p. 7.

45. See History of Delaware, vol. II, p. 676 (1929).

46. Tr. 6–8.

nues.[47] Under these circumstances, the College and its officials may be considered as performing an important state function.

## CONCLUSIONS OF LAW

■ A party seeking a preliminary injunction must make a clear showing that the balance of the following four factors favors granting the temporary relief sought: (1) the likelihood that the movant will prevail on the merits, (2) the likelihood that, in the absence of a preliminary injunction, the movant will suffer irreparable harm, (3) the harm to other parties interested in the proceedings that may result from a grant of injunctive relief, and (4) the public interest. *See A. O. Smith v. FTC*, 530 F.2d 515, 525 (C.A.3, 1976). The Court now turns to an evaluation of these factors in the circumstances of this case.

### I. *The Likelihood of Success on the Merits.*

■ The principal issue in this case is whether the defendants' decision not to renew the plaintiff in the position of Director on the ground that she had recently given birth to an illegitimate child deprived her of her constitutional rights. The plaintiff claims that the defendants violated her rights to substantive due process and equal protection of the laws as guaranteed by the Fourteenth Amendment. She also contends that the refusal to renew her contract constituted an unjustified interference with her right to personal privacy. For the reasons stated below, the Court finds that the plaintiff has shown a convincing and substantial likelihood of success on each of these claims.

■ Three different violations of substantive due process have been alleged. The plaintiff claims: (1) that the defendants had no basis in fact for discharging her; (2) that she received no warning that defendants regarded bearing an illegitimate child as a ground for termination; and (3) that the defendants refused to renew her contract on a basis that infringed her constitutionally protected right to privacy. The first two rights allegedly infringed, *viz.*, the right to freedom from arbitrary governmental decisionmaking and the right to advance notice of the requirements for maintaining public employment derive from the Due Process Clause itself and therefore exist only in conjunction with a constitutionally recognized life, liberty, or property interest. *See Ryan v. Aurora City Board of Education*, 540 F.2d 222, 228–29 (C.A.6, 1976); *Buhr v. Buffalo Public School District No. 38*, 509 F.2d 1196, 1202–03 (C.A.8, 1974); *Jeffries v. Turkey Run Consolidated School District*, 492 F.2d 1, 4 (C.A.7, 1974). That is, to prevail on either of those claims the plaintiff must show that she has been deprived of a protected liberty or property interest. *See Morris v. Board of Education of the Laurel School District*, 401 F.Supp. 188, 213 n. 36 (D.Del.1975).

■ The defendants argue that the plaintiff was not entitled to tenure and that she had no property interest in employment beyond the expiration of her contract on June 30, 1978. The plaintiff was a member of the "Professional Unclassified Staff" and was subject to the provisions of the Non-Bargaining Employees Handbook, which provides that employees who have served more than 90 days "shall only be terminated for cause."[48] The defendants contend that the word "termination" refers to dismissals occurring during the term of a contract and not to instances where a contract is not renewed. However, this argument is strained and conflicts with Dr. Mishoe's testimony that Professional Unclassified Employees can expect to have their contracts renewed from year to year "unless there is cause."[49] The Court concludes that the plaintiff has made more than a *prima facie* showing that, in light of the policies and practices of the College, she had a legitimate claim of entitlement to continued employment as Director and therefore was de-

---

**47.** Tr. 6.

**48.** PX 6, p. 17; the applicable provision is quoted in full after note 12 *supra*.

**49.** Tr. 88.

prived of a constitutionally protected property interest. *Perry v. Sindermann*, 408 U.S. 593, 599–603, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

■ If the decision not to renew plaintiff's contract was arbitrary or made for reasons that had no basis in fact, she was deprived of her right to substantive due process. *See Johnson v. Cain*, 5 E.P.D. ¶ 8509, at p. 7437 (D.Del.1973). Delaware State College has no written policy that bars unwed mothers from occupying the position of Director. Indeed, the first and only manifestation of such a policy was Dr. Mishoe's decision to recommend that the plaintiff not be rehired. Although the College's Board of Trustees accepted that recommendation, the only evidence in the record concerning the reasons for the decision is Dr. Mishoe's testimony. He gave the following reasons for not renewing the plaintiff's contract: (1) that being an unwed mother would prevent her from effectively performing her duties as Director, (2) that she had not fulfilled her contractual obligation to be of good moral character, and (3) that the College might lose public support if the fact that the Director had recently borne an illegitimate child became public knowledge.[50]

Dr. Mishoe explained the first reason while responding to a question whether the College had any policy concerning the sexual activities of faculty or staff members. He stated:

"We do not speak to the question of a person having sex. However, when a person is in a position, and the position states that this person has to do personal counseling to our students, and when we feel—and you can say I in this case—that this counseling will in all probability deal with the question of sex, family life, breakdown of family life, illegitimate children, and that kind of thing, when a person has a responsibility to counsel our students in those areas, and the life style of that person is contrary to what the counseling should be, then I feel that the person is essentially ineffective and [that] forms the basis of our action.

It is not the fact that a person had sex. It is the fact that the person, as I see it, the life style of the person is so contrary to what we want our students to receive in their counseling, so that I do not feel that the person can effectively carry out that responsibility." (Tr. 39–40).

The emphasis is clearly on the presumed inability of an unwed mother to counsel effectively, but this Court has found that the plaintiff was not responsible for counseling students on personal matters. Since there is no evidence that the plaintiff's "lifestyle" as an unwed parent would diminish her effectiveness in any other capacity, the Court rejects the first reason as unsupported by the factual record.

■ The second reason advanced by defendants is also constitutionally invalid because it is the result of an irrebuttable presumption adopted by the defendants as to which the presumed fact does not necessarily follow from the proven fact. *Andrews v. Drew Municipal Separate School District*, 507 F.2d 611, 615 (C.A.5, 1975), *cert. dismissed*, 425 U.S. 559, 96 S.Ct. 1752, 48 L.Ed.2d 169 (1976); *see Cleveland Board of Education v. La Fleur*, 414 U.S. 632, 644–45, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). That is, the fact of unwed parenthood does not conclusively establish present or continuing immorality on the part of plaintiff. The Fifth Circuit expounded upon the shortcomings of such a presumption at length in *Andrews v. Drew Municipal Separate School District, supra,* while declaring unconstitutional a school district rule making unwed parents ineligible to be hired as teachers' aides. The following observations of the Court are equally applicable to this case.

"[T]he rule leaves no consideration for the multitudinous circumstances under which illegitimate childbirth may occur and which may have little, if any, bearing on the parent's present moral worth. . . Furthermore, the policy, if based on moral judgment, has inherent if unintended

50. Tr. 39–40.

248

defects or shortcomings. While obviously aimed at discouraging [premarital] sex relations, the policy's effect is apt to encourage abortion, which is itself staunchly opposed by some on ethical or moral grounds. . . . Indeed, the superintendent's fiat, altogether unsupported by sociological data, equates the single fact of illegitimate birth with irredeemable moral disease." 507 F.2d at 615.

■ The final reason for the defendants' refusal to renew the plaintiff's contract, the possibility of an adverse public reaction, does not provide a justification for depriving plaintiff of her constitutional rights. The courts have rejected the proposition that

"interference with constitutional rights can be justified on the grounds that the community is hostile to their exercise and vigorously displays its feelings."

Langford v. City of Texarkana, 478 F.2d 262, 267 (C.A.8, 1973); see Cooper v. Aaron, 358 U.S. 1, 16, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). Therefore, this Court concludes that on the present record the defendants violated the plaintiff's right to substantive due process by arbitrarily excluding her from her job as Director. See Wieman v. Updegraff, 344 U.S. 183, 191–92, 73 S.Ct. 215, 97 L.Ed. 216 (1952).

■ The record also indicates that the plaintiff had no notice or warning that she would be terminated for deciding to bear an illegitimate child. The lack of notice of prohibited conduct may also constitute a violation of substantive due process. See Parducci v. Rutland, 316 F.Supp. 352 (D.Ala.1970).

As before stated, the claims discussed above were contingent on the existence of a property right; the plaintiff's other claims are not. In Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972), the Supreme Court held that:

"[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests."

Thus, the plaintiff would be entitled to relief if, as she contends, the refusal to renew her contract impermissibly burdened her right to personal privacy.[51]

■ The following summary of the applicable legal principals taken from Carey v. Population Services International, 431 U.S. 678, 684–85, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977), indicates that the plaintiff had a constitutionally protected right to choose whether or not to bear an illegitimate child.

"Although '[t]he Constitution does not explicitly mention any right of privacy,' the Court has recognized that one aspect of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment is 'a right of personal privacy, or a guarantee of certain areas or zones of privacy.' Roe v. Wade, 410 U.S. 113, 152, [93 S.Ct. 705, 35 L.Ed.2d 147] (1973). This right of personal privacy includes 'the interest in independence in making certain kinds of important decisions.' Whalen v. Roe, 429 U.S. 589, 599–600, [97 S.Ct. 869, 51 L.Ed.2d 64] (1977). . . .

The decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices. That decision holds a particularly important place in the history of the right of privacy, a right first explicitly recognized in an opinion holding unconstitutional a statute prohibiting the use of contraceptives, Griswold v. Connecticut, supra, and most prominently vindicated in recent years in the contexts of contraception, Griswold v. Connecticut, supra;

---

51. As noted above, the defendants' sole basis for discharging the plaintiff was the fact that she gave birth to an illegitimate child. Consequently, if the plaintiff ultimately establishes that that reason was constitutionally impermissible, she will be entitled to reinstatement. See Mount Healthy City Board of Education v. Doyle, 429 U.S. 274, 285–87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

*Eisenstadt v. Baird,* 405 U.S. 438, [92 S.Ct. 1029, 31 L.Ed.2d 349] (1972); and abortion, *Roe v. Wade, supra; Doe v. Bolton,* 410 U.S. 179, [93 S.Ct. 739, 35 L.Ed.2d 959] (1973); *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, [96 S.Ct. 2831, 49 L.Ed.2d 788] (1976). This is understandable, for in a field that by definition concerns the most intimate of human activities and relationships, decisions whether to accomplish or to prevent conception are among the most private and sensitive. *'If the right of privacy means anything, it is the right of the individual, married or single, to be free of unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.' Eisenstadt v. Baird, supra,* at 453, [92 S.Ct. 1029.]" (Emphasis supplied).

This does not mean, however, that the defendants and other government officials may never deny public employment to a person on the ground that he or she is the parent of an illegitimate child. But the courts will carefully scrutinize such decisions. The Supreme Court held in *Carey v. Population Services International, supra,* that

" . . . where a decision as fundamental as that whether to bear or beget a child is involved, regulations imposing a burden on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests."

At oral argument the defendants contended that this case is similar to *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), in which the Supreme Court upheld a state regulation that excluded nontherapeutic abortions from the class of medical expenses incident to pregnancy and child birth subsidized by the state's welfare program. In *Maher,* the Court held that a woman does not have an absolute right to have an abortion but rather a right to be free "from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy." *Id.* at 473--74, 97 S.Ct. at 2382. Because the Court found that the regulation did not impinge upon any fundamental right of privacy, it sustained the regulation under the less demanding rational basis test. *Id.* at 478–80, 97 S.Ct. 2376.

■ The defendants argue that their refusal to renew the plaintiff's contract does not directly interfere with her right to have an illegitimate child and that, under *Maher,* this Court should require only that they show their actions be rationally related to a legitimate state interest. This argument, which is reminiscent of the discredited notion that public employment is a "privilege" and not a "right," is wholly unpersuasive. In *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Supreme Court struck down a regulation that effectively disqualified a Saturday Sabbatarian from eligibility for unemployment compensation. The Court reaffirmed the well-established principle that conditions and qualifications upon governmental privileges and benefits that tend to inhibit constitutionally protected activity are invalid. *Id.* at 404 & n. 6, 405–06, 83 S.Ct. 1790. It is undisputed in the case *sub judice* that the plaintiff would have been rehired as Director had she not had a child out of wedlock. "[T]he imposition of such a condition upon even a gratuitous benefit inevitably deter[s] or discourage[s] the exercise of . . . [privacy] rights . . . and thereby threaten[s] to 'produce a result which the State could not command directly.'" *See Sherbert v. Verner, supra,* 374 U.S. at 405, 83 S.Ct. 1790. Accordingly, this Court concludes that the defendants must establish a compelling state interest for their decision not to renew the plaintiff's contract.

Having already concluded that the reasons given for the non-renewal of the plaintiff's contract may be arbitrary and without any basis in fact, the Court considers it virtually a foregone conclusion that the defendants will not be able to establish a compelling state interest sufficient to justify the intrusion upon the plaintiff's right to decide to bear an illegitimate child. In this connection the Court notes only two addi-

tional facts. First, there is no evidence to suggest that plaintiff would advise students to engage in premarital sex, bear an illegitimate child or do anything else the defendants might find objectionable. And second, the majority of students at Delaware State College are adults between the ages of 18 and 24.[52] Consequently, they are much less likely than younger children to accept uncritically the advice and lifestyle of those in positions of authority.

◼ The plaintiff also claims that the defendants violated her right to equal protection of the laws in that they took no action against other members of the Professional Unclassified Staff who are known to be parents of illegitimate children. Governmental employment policies which arbitrarily discriminate against a particular person, group or class have been held to violate the Equal Protection Clause. *E. g., Andrews v. Drew Municipal Separate School District,* 507 F.2d 611 (C.A.5, 1975), *cert. dismissed,* 425 U.S. 599, 96 S.Ct. 1752, 48 L.Ed.2d 169 (1976); *Trister v. University of Mississippi,* 420 F.2d 499 (C.A.5, 1969). Ms. Lewis has testified that two of the six women on her staff as Director had had children out of wedlock. In fact, one of those women is now Acting Director in the plaintiff's absence. The record also indicates that the College's librarian had a child out of wedlock and that the Resident Manager of one of the male dormitories is the father of an illegitimate child. Finally, the defendants have taken no action against Charles E. Henderson, Jr., who has admitted to the plaintiff and to the Family Court that he is the father of her child. Mr. Henderson is an assistant football coach and assistant director of the Student Center at the College.

Dr. Mishoe testified that he knew nothing about any of these matters prior to the institution of this lawsuit. He also testified that he had not removed any of the employees referred to from contacts with students because he was waiting for someone to establish that the allegations made by the plaintiff were true. Nothing in the record suggests that any of the professional staff identified as being parents of illegitimate children have significantly less contact with students in their jobs than the plaintiff did in hers. Nor is there any evidence that the defendants are actively investigating the allegations made by plaintiff. The record to date, therefore, supports an inference that the defendants do not intend to remove any of the individuals referred to from their present position. Because no rational basis has been advanced by the defendants for the disparate treatment accorded the plaintiff, the Court finds that the plaintiff also has met her burden of showing a probability of success on the merits of her equal protection claim regardless of the level of scrutiny applied.[53]

## II. *Irreparable Harm.*

◼ The plaintiff avers that she will suffer irreparable harm unless she is granted injunctive relief because (1) she has been deprived of her constitutional rights; (2) she may be forced to declare bankruptcy due to the $5,867 reduction in her salary; (3) she will be stigmatized by the loss of her position as Director for what has been deemed "immoral conduct," and (4) there is a shortage of positions of equal responsibility available at a comparable salary level.

The factual record does not support either the third or the fourth allegation and the Court rejects both of them. Whether the monetary loss the plaintiff will suffer during the pendency of this litigation due to the $5,867 reduction in her annual salary constitutes irreparable injury depends on whether she has an adequate remedy at law. As the Court noted in footnote 3, *supra,* the Eleventh Amendment may bar an action in federal court for damages and back pay against the College and the individual defendants in their official capaci-

---

**52.** Tr. 13.

**53.** The plaintiff argues that the defendants have discriminated against her in a way that intrudes upon a fundamental right of privacy and therefore strict scrutiny is required. For present purposes, it is unnecessary to decide that issue.

ties. The parties did not brief or argue this issue or the related issues of whether the plaintiff would be entitled to damages against the defendants in their individual capacities and whether the defendants have an adequate remedy for damages in the state courts. However, the Court finds it unnecessary to resolve any of these questions because the plaintiff's strong showing of probable success on the merits of her claims that she has been deprived of her constitutional rights of privacy, substantive due process and equal protection is sufficient to establish the likelihood of irreparable harm.

In *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976), the Supreme Court held that:

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

And most courts have granted preliminary injunctive relief in cases where a deprivation of constitutional rights has been alleged and a strong probability of success on the merits has been established without requiring additional proof of irreparable harm. 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at p. 440 n. 39; *see, e. g., Quaker Action Group v. Hickel,* 421 F.2d 1111, 1116 (C.A.D.C.1969); *Keefe v. Geanakos,* 418 F.2d 359 (C.A.1, 1969); *Henry v. Greenville Airport Commission,* 284 F.2d 631, 633 (C.A.4, 1960). The Third Circuit endorsed this view in *Lewis v. Kugler,* 446 F.2d 1343, 1350 (C.A.3, 1971), stating:

"Persons who can establish that they are being denied their constitutional rights are entitled to relief, and it can no longer be seriously contended that an action for money damages will serve adequately to remedy unconstitutional searches and seizures." (Footnotes omitted).

*Accord Wecht v. Marsteller,* 363 F.Supp. 1183, 1190 (W.D.Pa.1973); *Public Funds for Public Schools of New Jersey v. Marburger,* 358 F.Supp. 29, 42–43 (D.N.J.1973), *summarily aff'd,* 417 U.S. 961, 94 S.Ct. 3163, 41 L.Ed.2d 1134 (1974); *Hairston v. Hutzler,* 334 F.Supp. 251, 254 (W.D.Pa.1971).

The plaintiff in this case has made a strong showing that her constitutional rights were violated and that, as a result, she has had to accept a lower paying job in other than her chosen field.[54] Under the cases cited above, no further showing of irreparable harm is required.

### III. Harm to Other Interested Parties.

The defendants contend that they will suffer harm if the Court orders them to reinstate the plaintiff because she can no longer be effective as a counselor for the approximately 450 women in residence at Delaware State College. However, as the Court noted in assessing the merits of the plaintiff's claims, she does not in fact counsel students regarding personal or social problems. Moreover, the woman currently serving as Acting Director also has a child born out of wedlock. The plaintiff performed her responsibilities as Director satisfactorily for at least six years and the Court has no reason to expect that her status as an unwed mother will reduce her effectiveness in the future.

The defendants further contend that reinstatement of the plaintiff may lead to a decrease in female enrollment and a reduction in future appropriations to the College by the General Assembly. There is no evidence to support these fears and, even if there were, the Court does not consider community resentment a permissible ground for denying injunctive relief in this case. *See Sterzing v. Fort Bend Independent School District,* 496 F.2d 92, 93 (C.A.5, 1974) (per curiam).

On the other hand, the defendants can be expected to derive some benefit from an order of reinstatement, since it will enable

54. This case is distinguishable from *Waters v. City of Wilmington,* Civil Action No. 78–259 (D.Del., June 27, 1978) (slip op. at 11), in which the Court refused to hold that the possible deprivation of a procedural due process right per se constituted irreparable harm. In *Waters* the plaintiff sought reinstatement pending trial but he had not shown a probability of success on the merits of his claim for reinstatement. *Id.* at 6–7.

252

them to eliminate the position of financial aid counselor, which they created specifically to accommodate the plaintiff.[55] A preliminary injunction will also avoid the equitable problems that would arise if the defendants replaced the plaintiff as Director and later had to reinstate her.

Finally, the Court will require the plaintiff, pursuant to Rule 65(c), F.R.Civ.P., to post an unsecured bond in the amount of $5000 to ensure that, in the event the defendants prevail at trial, the College is reimbursed for any excess monies paid to the plaintiff as a result of the preliminary injunction.

IV.  *The Public Interest.*

■ The defendants argue that because this case has received widespread publicity, reinstatement of the plaintiff to her former position pending resolution of this litigation will be interpreted as sanctioning bearing children out of wedlock. Perhaps so, but that is not the intent of the Court's action today. The Court expresses no opinion on the morality of bearing illegitimate children. The Court does hold, however, that governmental policies that intrude on a person's private right to bear or beget an illegitimate child must be supported by a compelling state interest and be tailored to achieve that interest without needlessly burdening a recognized constitutionally protected freedom. The evidence in this case clearly establishes that the plaintiff had no notice that bearing a child while unmarried was considered grounds for dismissal, that the reasons given for the non-renewal of her contract had almost no basis in fact, and that other similarly situated employees of the College who have had illegitimate children are not likely to be disciplined. The public interest would be disserved if such flagrant disregard for an individual's constitutional rights were tolerated for even a minimal period of time.

■ Accordingly, the Court concludes that the plaintiff is entitled to the temporary injunctive relief she seeks. An order

will be entered directing the defendants to reinstate her as Director pending final resolution of this action.

This Opinion shall constitute the Court's findings of fact and conclusions of law as required under Rule 52(a), F.R.Civ.P., on the plaintiff's motion for a preliminary injunction.