Katie Mae ANDREWS and Lestine Rogers, Plaintiffs-Appellants-Cross-Appellees,

v.

The DREW MUNICIPAL SEPARATE SCHOOL DISTRICT et al., Defendants-Appellees-Cross-Appellants.

No. 73–3177.

United States Court of Appeals, Fifth Circuit.

Feb. 3, 1975.

Charles Victor McTeer, Greenville, Miss., Johnnie E. Walls, Jr., Willie L. Bailey, Greenwood, Miss., Lewis Myers, Jr., Oxford, Miss., Catherine P. Mitchell, Mound Bayou, Miss., for plaintiffs-appellants-cross-appellees.

Nancy Stearns, New York City, for Center for Constitutional Rights, amicus curiae.

A. F. Summer, Atty. Gen., Wm. A. Allain, 1st Asst. Atty. Gen., Heber Ladner, Jr., Jackson, Miss., Champ T. Terney, Jr., Indianola, Miss., for defendants-appellees-cross-appellants.

Linda Colvard Dorian, Wm. A. Carey, Gen. Counsel, Julia P. Cooper, Asst. Gen. Counsel, Washington, D. C., for Equal Employ.

Before BELL, SIMPSON and INGRAHAM, Circuit Judges.

SIMPSON, Circuit Judge:

This suit attacking the validity of the Drew Municipal School District's rule against employing parents of illegitimate children was initiated by two such parents, both mothers, against whom the rule militated. Named as defendants were the Drew Municipal School District (the District), George Ferris Pettey, its Superintendent, and the individual members of the District's Board of Trustees (the Board).

The complaint sought declaratory and injunctive relief to "redress the deprivation of rights and privileges and immunities of the plaintiffs guaranteed by the (sic) 42 U.S.C. 1981, 1983 et seq., Title VI of the Civil Rights Act of 1964, 42 U.S.C. Section 2000d et seq.,[1] the Fifth and Fourteenth Amendments to the United States Constitution. Plaintiffs further asked for declaratory relief under 28 U.S.C. Section 2201, 2202." Jurisdiction was invoked under Title 28 U.S.C. Section 1343.

Following a series of hearings the district court decided the case on the merits, holding that the rule violated both the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment. Andrews v. Drew Munici-

---

1. In paragraphs 11, 12 and 13 of the complaint, the plaintiffs detailed their claims of violations of their rights under the heading "VIOLATIONS OF LAW". The refusal by the defendants to employ plaintiff Andrews and the termination of the plaintiff Rogers was asserted to delegate the plaintiffs into an unconstitutionally created classification based upon their race, sex and unmarried parent status in violation of the constitutional and statutory provisions enumerated in the text, including Title VI of the Civil Rights Act of 1964, 42 U.S.C., Section 2000d. It was further alleged that Andrews was refused employment because of her race, sex and single parent status and that Rogers was discharged from her teachers' aide position because of her race, sex and single parent status, all in violation of the same constitutional and statutory provisions.

The district court's decision, Andrews v. Drew Municipal Separate School District, N.D.Miss.1973, 373 F.Supp. 27, contains no findings or conclusions with respect to violation of Title VI of the Civil Rights Act, Title 42, U.S.C., Sec. 2000d.

The complaint contained no assertion that Title VII of the Civil Rights Act of 1964, the Equal Employment Opportunities provision, Title 42, U.S.C. § 2000e et seq., was violated. No assertion of any violation of Title VII was made during the district court proceedings, and the district judge made no findings or conclusions as to violations of Title VII.

pal Separate School District, N.D.Miss. 1973, 371 F.Supp. 27. We affirm for reasons stated below.

In the Spring of 1972, Superintendent Pettey learned that there were some teacher aides presently employed in the District who were parents of illegitimate children. Disturbed by this knowledge, Pettey immediately implemented an unwritten edict to the effect that parenthood of an illegitimate child would automatically disqualify an individual, whether incumbent or applicant, from employment with the school system.[2] There is no doubt that the policy is attributable solely to Pettey; there was no evidence that he sought either the prior advice or the consent of the Board.[3]

Mrs. Fred McCorkle is one of the administrators responsible for implementing the unwed parent policy. As Coordinator of Elementary Instruction for the school district, she is in charge of the teacher aide program and recommends to Pettey who shall be hired to fill teacher aide vacancies. All potential teacher aides must submit an application to Mrs. McCorkle who then interviews them and investigates their applications. The investigation consists of consultations with other administrative staff members as well as the principals of the various schools concerning their knowledge of the applicant.

Both plaintiffs-appellees, Lestine Rogers and Katie Mae Andrews, were victims of the unwed parent policy. Lestine Rogers was hired as a teacher aide in the Fall preceding the initiation of the rule, although her application stated that she was single and had a child. After the Pettey policy rule was announced, Mrs. McCorkle informed Ms. Rogers that because she was the parent of an illegitimate child, she would not be re-hired for the following year. Katie Mae Andrews, on the other hand, knew about the Pettey rule prior to applying for a teacher aide position. Although she too was the mother of an illegitimate child, she did not so indicate on her application. Mrs. McCorkle learned of Ms. Andrews' illegitimate child in the course of her investigation of the application. She made a written notation of her finding on the application,[4] and refused to consider Ms. Andrews further.

From the beginning, unwed mothers only, not unwed fathers, were adversely affected by the rule. This factor coupled with the conclusion that the policy, by its nature, could only be applied against females, led the district court to hold alternatively that "assuming a rational relation does exist between the Drew policy and legitimate educational objectives, the rule creates an inherently suspect classification based on sex, i. e. single women, which cannot survive strict scrutiny mandated by the Fourteenth Amendment." 371 F.Supp. at 35. The district court's primary holding was that the rule "has no rational relation to the objectives ostensibly sought to be achieved by the school officials and is fraught with invidious discrimination; thus it is constitutionally defective under the traditional, and most lenient, standard of equal protection and violative of

2. Pettey in testimony indicated confusion as to the expanse of the policy he had promulgated. He was positive that the rule should apply to all instructional personnel. Upon questioning, he expanded the list to include not only teachers and teacher aides, but also secretaries, librarians, dieticians, cafeteria operators, nurses, social workers, school principals, school volunteers and even PTA presidents. Although he was not positive, he did not think the rule should apply to bus drivers, janitors or maids.

3. The Board and its individual members were unaware of the rule until the commencement of this action. The evidence indicates, however, that the Board then ratified the policy and all actions taken under it.

4. Across the top front of Ms. Andrews' application, Mrs. McCorkle wrote, "Single with a child 3 or 4." On the back of the application, Mrs. McCorkle wrote:

"This applicant would have been hired in January 1973 if I had not received information from Mrs. Clara Robinson and others at James Elementary that she had a child. The applicant stated on her application that she was single and had no children. When she called by phone in January I informed her of the school policy and have had no contact with this applicant since then."

due process as well." Ibid. at 31. Thus this appeal concerns a policy or rule that has not only been held to violate equal protection for alternative reasons, but has also been held to violate due process. On the basis relied upon by the district court of traditional notions of equal protection, because the policy created an irrational classification, we affirm.[5]

"Traditional" equal protection analysis requires that legislative classifications must be sustained as long as the classification itself is rationally related to a legitimate governmental interest. United States Department of Agriculture v. Moreno, 1973, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782; Jefferson v. Hackney, 1972, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285; Weber v. Aetna Casualty & Surety Co., 1972, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768. To find the governmental objective ostensibly served by the rule, we turn to the testimony of Superintendent Pettey, the rule's originator and explicator. Pettey's avowed objective was to create a scholastic environment which was conducive to the moral development as well as the intellectual development of the students. Certainly this objective is not without legitimacy. See Shelton v. Tucker, 1960, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231; Adler v. Board of Education, 1952, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517. Schools have the right, if not the duty, to create a properly moral scholastic environment. See Beilan v. Board of Education, 1958, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414. But the issue is not simply whether the objective itself is legitimate, but rather whether the Pettey rule "advances that objective in a manner consistent with the Equal Protection Clause," Reed v. Reed, 1971, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225. We hold that it does not.

The District offers three possible rationales through which it asserts that its rule under attack furthers the creation of a properly moral scholastic environment: (1) unwed parenthood is prima facie proof of immorality; (2) unwed parents are improper communal role models, after whom students may pattern their lives; (3) employment of an unwed parent in a scholastic environment materially contributes to the problem of school-girl pregnancies.

■ The first of these postulates violates not only the Equal Protection Clause, but the Due Process Clause as well. The law is clear that due process interdicts the adoption by a state of an irrebuttable presumption, as to which the presumed fact does not necessarily follow from the proven fact. See Cleveland Board of Education v. LaFleur, 1974, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52; Vlandis v. Kline, 1973, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63; Stanley v. Illinois, 1972, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551. Thus, unless the presumed fact here, present immorality,[6] necessarily follows from the proven fact, unwed parenthood, the conclu-

---

5. Because we affirm upon traditional equal protection grounds, we do not consider the district court's alternative finding of a sex based classification or its legal conclusion that such classifications are inherently suspect.

6. If a state investigates the moral character of an individual upon whom it intends either to bestow a benefit or to impose a burden, due process requires that such inquiry look to *present* moral character. Thus, in Schware v. Board of Bar Examiners of New Mexico, 1957, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796, the Supreme Court held that the New Mexico Board of Bar Examiners violated an applicant's due process rights by refusing to consider his evidence of present good moral character in disallowing him membership to the bar. The Board relied instead on negative inferences drawn from Schware's past, in that approximately fifteen years prior to entering law school, he was a member of the Communist party, made use of aliases and had an arrest record. In reversing the Board's denial of admission, the Court noted that "if (Schware) otherwise qualifies for the practice of law and is admitted to the bar, the State has ample means to discipline him for any future misconduct." 353 U.S. at 247, n. 20, 77 S.Ct. at 760, n. 20.

siveness inherent in the Pettey rule[7] must be held to violate due process. We agree with the district court that the one does not necessarily follow the other:

> By the rule, a parent, whether male or female, who has had such a child, would be forever precluded from employment. Thus no consideration would be given to the subsequent marriage of the parent or to the length of time elapsed since the illegitimate birth, or to a person's reputation for good character in the community. A person could live an impeccable life, yet be barred as unfit for employment for an event, whether the result of indiscretion or not, occurring at any time in the past. But human experience refutes the dogmatic attitude inherent in such a policy against unwed parents. Can it be said that an engaged woman, who has premarital sex, becomes pregnant, and whose fiance dies or is killed prior to their marriage, is morally depraved for bearing the posthumous child? The rule allows no compassion for the person who has been unwittingly subjected to sexual relations through force, deceptive design or while under the influence of drugs or alcohol, yet chooses to have the child rather than to abort it. The rule makes no distinction between the sexual neophyte and the libertine. In short, the rule leaves no consideration for the multitudinous circumstances under which illegitimate childbirth may occur and which may have little, if any, bearing on the parent's present moral worth. A past biological event like childbirth out of wedlock, even if relevant to the issue, may not be controlling; and that it may be considered more conventional or circumspect for the infant to be surrendered to others for upbringing rather than be reared by the natural parent is hardly determinative of the matter. Furthermore, the policy, if based on moral judgment, has inherent if unintended defects or shortcomings. While obviously aimed at discouraging premarital (sic) sex relations, the policy's effect is apt to encourage abortion, which is itself staunchly opposed by some on ethical or moral grounds. It totally ignores, as a disqualification, the occurrence of extra-marital sex activity, though thought of by many as a more serious basis for moral culpability. Indeed, the superintendent's fiat, altogether unsupported by sociological data, equates the single fact of illegitimate birth with irredeemable moral disease. Such a presumption is not only patently absurd, it is mischievous and prejudicial, requiring those who administer the policy to "investigate" the parental status of school employees and prospective applicants. Where no stigma may have existed before, such inquisitions by overzealous officialdom can rapidly create it. 371 F.Supp. at 33–34 (footnotes deleted).

We observe also that there are reasonable alternative means through

---

7. The conclusiveness of the Pettey rule was testified to by Superintendent Pettey himself:

Q. So I take it, Mr. Pettey, that a person who supposedly has a, quote, illegitimate child, as you put it, that fact, no matter when it took place or no matter under what circumstances it took place, is prima facie evidence of a lack of morality:

A. It would be to me, yes.

\* \* \* \* \* \*

THE COURT: Mr. Pettey, you do not think the facts or circumstances under which an illegitimate birth occurred is at all relevant to the issue of good character or bad character?

A. No sir. That would be hard to get at. I think the fact that the birth occurred without the benefit of matrimony is, to me, proof enough of the . . . .

THE COURT: Is conclusive?

A. Yes sir.

\* \* \* \* \* \*

THE COURT: . . . Suppose a woman had an illegitimate child and then later married either the father of the child or another man. When she presented herself to you she showed she was married and had a child, one child. Would you consider her for employment?

A. No, sir, I would not.

which to remove or suspend teachers engaging in immoral conduct; means that guarantee the teacher a public hearing on the merits and right of appeal. 5 Miss.Code Sec. 6282–26 (1971 Supp.).[8] By denying a public hearing to which all other teachers charged with immoral conduct are entitled, the policy denies unwed parents equal protection of the laws. Insofar as the rule inextricably binds unwed parental status to irredeemable immorality, it violates both due process and equal protection.

■ The school district urges a second rationale for its rule based upon the holding in McConnell v. Anderson, 8 Cir. 1971, 451 F.2d 193:

> "What the school board looks at is whether, moral considerations aside, proper educational growth can be furthered and respect for marriage ingrained by employing unwed parents. The question then becomes whether the open and notorious existence of the status as an unwed parent would injure the affected students." Reply Brief of Defendants/Appellants, p. 5.

McConnell, a male homosexual, had been offered a position at the University of Minnesota pending approval of the Board of Regents. While Board action was pending, McConnell and a male friend attempted to obtain a marriage license, an event which generated at least four local newspaper articles as well as local radio and television news coverage. Following this action the Board disapproved McConnell's appointment with the statement that his "personal conduct, as represented in the public and University news media, is not consistent with the best interest of the University."[9] 451 F.2d at 194. In upholding the Board of Regents' decision, the Eighth Circuit specified that McConnell was not denied employment because of his homosexual tendencies or his desire to continue homosexual conduct clandestinely, but rather because of his "activist role in implementing his unconventional ideas concerning the societal status to be accorded homosexuals," which would have had the effect of forcing "tacit approval of this socially repugnant concept" upon the University. 451 F.2d at 196.

We do not consider McConnell supportive of the District's position. The record before us contains no evidence of proselytizing of pupils by the plaintiffs and reveals instead that each plaintiff, along with her illegitimate offspring, is living under the same roof as her parents, brothers and sisters. It would be a wise child indeed who could infer knowledge of either plaintiff's unwed parent status based on the manner of plaintiffs' existence. As the district court observed:

> "In the absence of overt, positive stimuli to which children can relate, we are convinced that the likelihood of inferred learning that unwed parenthood is necessarily good or praiseworthy, is highly improbable, if not speculative. We are not at all persuaded by defendants' suggestions, quite implausi-

---

**8.** Sec. 6282–26 reads, in pertinent part:

> Suspension of superintendent, principal, or teacher—notice—appeal.—For incompetence, neglect of duty, immoral conduct, intemperance, brutal treatment of a pupil or other good cause the county superintendent of education or superintendent of the municipal separate school district, as the case may be, may remove or suspend any . . . teacher in any school district, but before being so removed or suspended the . . . teacher shall be notified of the charges against him and he shall be advised that he is entitled to a public hearing upon said charges at a date to be fixed in such notice. . . . From the decision made at said hearing the . . . teacher shall be allowed an appeal to the state board of education . . . .. Any party aggrieved by the said ruling of the state board of education may effect an appeal therefrom to the chancery court . . . ..

**9.** We think it significant also that upon request, McConnell was given an opportunity to appear before the Board of Regents with counsel to present information claimed to support his application. It was only after this hearing that the Regents adopted the resolution to disapprove the appointment.

ble in our view, that students are apt to seek out knowledge of the personal and private family life-styles of teachers or other adults within a school system (i. e. whether they are divorced, separated, happily married or single, etc.), and, when known, will approve of and seek to emulate them." 371 F.Supp. at 35.

In our view then, the school district's second offered justification for the unwed parent policy also falls short of equal protection requirements.

The third rationale proffered by the school district in hopes of salvaging the Pettey rule, that the presence of unwed parents in a scholastic environment materially contributes to school-girl pregnancies is without support, other than speculation and assertions of opinion, in the record before us.

Because we hold that the Board rule under attack violated traditional concepts of equal protection, we find it unnecessary to discuss numerous other issues urged on appeal by appellees or in their behalf by *amici curiae*; for example, whether the rule creates a suspect classification based upon race or sex, or whether it infringes upon some constitutionally protected interest such as the right to privacy or the right to procreation.[10]

■ Finally we find insufficient justification to reverse on cross-appeal the district court's denial of attorney fees.[11]

Affirmed.

---

10. Both the Equal Employment Opportunity Commission and the Center for Constitutional Rights filed *Amicus Curiae* briefs before this court urging that the basis for our decision be broadened to include some or all of these issues. Both Amici sought and were denied leave to participate in oral argument.

11. Despite his alternative ground of decision, discrimination as to sex in violation of the Fourteenth Amendment, the district judge denied the award of attorneys' fees in a separate order entered after his injunctive and declaratory decree. No reasons were assigned. Because of the strong congressional policy against unlawful discrimination in employment, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; Weeks v. Southern Bell Tel. & Tel. Co., 5 Cir. 1969, 408 F.2d 228,

we would seriously consider reversal for failure to award attorneys' fees, if we could base our affirmance on that congressional policy's proper vindication. See Clark et al. v. American Marine Corporation, 5 Cir. 1971, 437 F.2d 959, affirming per curiam, Clark et al. v. American Marine Corporation, E.D.La.1970, 320 F.Supp. 709; cf. Newman v. Piggie Park Enterprises, 1968, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263. But review of the finding of discrimination as to sex, especially since no Title VII violation was asserted by the pleadings or dealt with by the trial court, (Note 1, supra) presents a thicket we deem it unwise to enter. In the procedural posture which has evolved, we perceive no error in the refusal to award attorneys' fees.