**Paula Rebecca HARVEY, Plaintiff,**

v.

**YOUNG WOMEN'S CHRISTIAN ASSOCIATION, a/k/a YWCA, Defendant.**

No. C–C–78–0081–P.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Feb. 9, 1982.

Charles E. Houston, Jr., Walterboro, S. C., for plaintiff.

George V. Hanna, III, Julia Jones, Moore & Van Allen, Charlotte, N. C., for defendant.

## OPINION AND ORDER

POTTER, District Judge.

### FINDINGS OF FACT

In October of 1974, Paula Rebecca Harvey, Plaintiff, a twenty-two year old, unmarried, black female applied for a position with the Young Women's Christian Association (YWCA) of Charlotte, North Carolina. The YWCA is a non-profit community service organization that sponsors or directs educational, recreational, social, and religious programs for young women and girls in the Charlotte community. The mission and purpose of the YWCA are set forth in its official "Imperative" and "Purpose", both of which are conspicuously and repeatedly espoused by the organization and its members among themselves and to the general public. Engraved on large wall plaques at the YWCA's main office and recreational building, recited by members at the beginning or close of official meetings, and displayed in the group's official publications and printed programs, the YWCA's official "Imperative" and "Purpose" are stated as follows:

"Our One Imperative: To thrust our collective power toward the ELIMINATION OF RACISM wherever it exists and by any means necessary." (emphasis in original)

"The YWCA Purpose: The Young Women's Christian Association of the United States of America a movement rooted in the Christian faith as known in Jesus and nourished by the resources of that faith, seeks to respond to the barrier-breaking love of God in this day.

"The Association draws together into responsible membership women and girls of diverse experiences and faiths, that their lives may be open to new understandings and deeper relationships and that together they may join in the struggle for peace

and justice, freedom and dignity for all people."

By letter dated December 3, 1974, the YWCA extended an offer of employment to Ms. Harvey for the position of "Program Director I." In this letter, the YWCA advised Ms. Harvey as follows:

Your signature on this letter indicates that you understand and accept the position and conditions of employment, including your willingness to become a voting member of the YWCA and *to accept individual responsibility for the achievement of the Purpose which is as follows*: [official "Purpose" stated]. (emphasis added)

In the printed Job Description for the position of Program Director I, which plaintiff admits to having received and read, the defendant organization again emphasizes its expectations that its employee will adopt and advocate the official "Purpose" and "Imperative". As stated in the "Introduction" to the Job Description: "It is essential that Professional Staff members understand and accept the Purpose and Imperative and show evidence of this through program planning and job performance." In the section captioned "Responsibilities: Program Planning:" it further states that the Program Director I "[p]lans program that is within the Purpose and philosophy of the YWCA." Also, the YWCA Manual of Personnel Policies, a document introduced into evidence by plaintiff, states that "[a] professional staff member must be willing to accept the Purpose of the YWCA and assume responsibility for implementing it into her work." [1]

On December 12, 1974, plaintiff signed the agreement in the job offer, and began work as a Program Director in January of 1975. Plaintiff at first managed classes in informal education, planning instruction sessions for young women and girls in such leisure type activities as cooking, dancing, and gardening.

After approximately one year, plaintiff requested that she be allowed to initiate a program whereby she could work with groups of teenagers in a community setting. For this program, plaintiff assessed the needs of the Hoskins Community, a predominantly black, lower-middle class neighborhood on the north side of Charlotte. Plaintiff was able to form two youth groups, ages eight to eleven in one group, and twelve and over in the other, which met in homes or at a local church to plan recreational and social activities. Ms. Lynn Reyburn, plaintiff's supervisor for this community project, testified that programs planned by plaintiff sought to meet the needs of these youth groups regarding recreation, skills development and socialization. The term "socialization" referred to, among other things, the development of learning skills, values, and relationships with other people in the community. Plaintiff spent approximately half of her working hours each day meeting with these youth groups or otherwise developing the Hoskins project. Plaintiff's responsibilities in this program were further set out in her "Job Assignment" list, wherein it is stated that in the Hoskins Community Area Program, the plaintiff "Interprets YWCA Purpose and philosophy to groups and community." Finally, as to this project, plaintiff, in her "Self Evaluation" report of November 10, 1975, stated that her major accomplishment of the past year had been the establishment of this YWCA program in the Hoskins Community.

At virtually the peak of the planning and development of this community youth program, plaintiff discovered in late March or early April of 1976 that she was pregnant. Shortly after learning of her pregnancy, plaintiff met with Ms. Micki Riddick, also a black female and the Executive Director of the Charlotte YWCA, to discuss the possible impact of her unwed pregnancy on her job status. At this meeting, Ms. Riddick asked plaintiff how she could continue to work

---

1. As supportive of defendant's claim that it is an organization of women and for women, it is interesting to note that this Manual of Personnel Policies, prepared by defendant for its employees, refers to the employees exclusively by the use of the feminine pronouns "she" and "her".

with teenagers, being pregnant and unmarried. Plaintiff's response, as stated by Ms. Riddick, and uncontroverted at trial,[2] was that she, plaintiff, could offer herself to the teenagers in her condition of unwed pregnancy, as a role model of an alternative lifestyle.

Ms. Riddick indicated that plaintiff's situation of being pregnant and unmarried, working with teenage girls in community programs, and wishing to offer herself as an "alternative lifestyle" role model placed the YWCA in a very difficult position. She then informed plaintiff that the Personnel Committee of the YWCA would have to be consulted for advice. Two or three days later, the committee met and discussed the issue, and recommended that plaintiff be requested to resign with one thousand ($1,000.00) dollars severance pay or face involuntary dismissal. Ms. Riddick informed plaintiff of this decision and on April 30, 1976, plaintiff submitted a letter of resignation, which indicated that she was resigning because she faced termination anyway and had no other alternatives.

Ms. Riddick testified at trial that plaintiff was fired not because of her race and not because of her pregnancy, but rather because she wished to advocate an alternative lifestyle of unmarried parenthood to her community youth groups and such conduct would be contrary to the purpose and functions of the YWCA in its service to young women and girls. Lynn Reyburn, plaintiff's immediate supervisor in the community program area, concurred in the decision to ask plaintiff to resign. Ms. Reyburn testified that the condition of unmarried pregnancy of a staff member involved in teaching teenagers would be incompatible with the goals of the YWCA. Ms. Reyburn stressed that the YWCA reaches out to develop the mind, body, and spirit of young women, and for plaintiff to offer herself as a role model of unwed pregnancy would be contrary to the YWCA's purpose.

Mrs. Lib Harkey, a member of the Board of Directors, Chairman of the Personnel Committee, and later President of the YWCA also testified that for plaintiff to offer unwed motherhood as an alternative lifestyle in the teenage program would be completely incompatible with the goals of the YWCA.

At the time she asked plaintiff to resign, Ms. Riddick had considered the possibility of transferring her to another position where she would not be in a counselling or youth group leadership position. However, there were no such positions available, and the YWCA did not have the funds to create a new position. Consequently, Ms. Riddick told plaintiff that she would like to help her get a position of a noncounselling nature in another office of the YWCA, and asked her to fill out an application to the National Office. The employment procedures and policies of the National Office did not permit outright transfers of personnel between local offices, but required persons desiring a new position in another community to make an official application. Ms. Riddick informed plaintiff that the National Office would seek a position for plaintiff if she would submit an application. Plaintiff declined to even apply to the National Office for a position through this procedure offered by Ms. Riddick, and despite Ms. Riddick's stated willingness to help her, plaintiff did not seek further help or advice from her.

Upon leaving her position at the YWCA, plaintiff worked at numerous jobs in Virginia, North Carolina, and South Carolina, including the following, which paid higher salaries than the $7,500 a year she was earning at the YWCA: Petersburg, Virginia Prison System (six months at $10,-000/year); Low Country Community Action, South Carolina (less than six months at $9,500/year); Southside Training Center, Virginia (four months at $9,000/year);

2. Despite the allegation to the contrary in plaintiff's post-trial brief, the record indicates that at no time during the trial did plaintiff refute, implicitly or explicitly, the testimony of Ms. Riddick, Ms. Reyburn, and Mrs. Harkey that plaintiff had expressed an intent to advocate herself and condition of unwed pregnancy as an "alternative lifestyle" role model to her youth groups.

Equal Employment Opportunity Commission, North Carolina (three and a half years to the present at $10,000/year). This and other evidence presented at trial tended to question plaintiff's good faith efforts to secure and remain in active employment. Plaintiff's child was born on December 12, 1976 and her maternity medical care was paid for by the Catholic Social Services of the Diocese of Charlotte.

The final witness in the case, called on rebuttal by plaintiff, was Dr. Virginia Stevens, Executive Director of the Charlotte YWCA for the past three years. Dr. Stevens testified that during the time plaintiff was working at the YWCA, three other unmarried, black females became pregnant and were not terminated because they were in clerical positions that did not bring them into contact with the young women members on a counselling or leadership basis. Dr. Stevens also testified that a white female swimming instructor had been hired during this time without any knowledge of her marital or parental status. Only at the time of plaintiff's trial did Dr. Stevens and the YWCA find out that this white swimming instructor had an illegitimate child that was three years old at the time she was hired. Dr. Stevens further testified that the swimming instructor had never suggested or offered her status as an unwed parent as a role model or alternative lifestyle to the young women she coached.

As to other related incidents of pregnancy, both parties stipulated at trial that during this time period in which plaintiff was employed by the defendant, two *married* white female employees of the YWCA had been given paid maternity leave and returned to their positions.

## CONCLUSIONS OF LAW

The primary basis for plaintiff's claim of sex and race discrimination is found in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended 1972, 1978. Title VII prohibits the discharge or other employment discrimination of any employee based on race, color, religion, sex, or national origin. Regulations issued by the Equal Employment Opportunity Commission have further established that

[a] written or unwritten employment policy or practice which excludes from employment ... employees because of pregnancy, childbirth, or related medical condition, *is in prima facie violation of Title VII.* 29 C.F.R. § 1604.10(a), 1972 (emphasis added.)

Caselaw and the legislative history of the 1978 amendments to Title VII indicate that this regulation is a proper interpretation of the Act. *See, e.g. Holthaus v. Compton and Sons, Inc.*, 514 F.2d 651, 653 (8th Cir. 1975); *see also, Prohibition of Sex Discrimination Based on Pregnancy, H.R.Rep.* No. 95–948, 95th Cong., 2d Session 53 (1978) U.S. Code Cong. & Admin.News (1978) p. 4749.[3]

■ Once a plaintiff has proven a *prima facie* case of discrimination under Title VII, the burden is then on the defendant to articulate some legitimate, nondiscriminatory reason for the employee's dismissal, or to show that any discriminatory effect is the result of a legitimate business necessity or otherwise within the bona fide occupational qualifications exception of Title VII. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 249–253, 101 S.Ct. 1089, 1091–1093, 67 L.Ed.2d 207 (1981); *Nashville Gas Co. v. Satty*, 434 U.S. 136, 143, 98 S.Ct. 347, 352, 54 L.Ed.2d 356 (1977); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *see also*, 42 U.S.C. § 2000e–2(e). If the defendant is able to show a nondiscriminatory reason for the dismissal or a legitimate reason for its action resulting in discriminatory effect, then the plaintiff, to prevail, must prove by a preponderance of the evidence that the reasons offered by the defendant are merely a pretext and that discriminatory reasons more likely motivated the employer in its action toward the

3. Title VII was amended in 1978 to specifically incorporate the philosophy of this regulation into the Act. Known under the popular name of "The Pregnancy Discrimination Act," the amendment specifically includes discrimination based on the fact or condition of pregnancy within the definition of sex discrimination. 42 U.S.C. § 2000e(k), 1964, as amended, 1978.

plaintiff. *Texas Department of Community Affairs v. Burdine, supra; McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 805–806, 93 S.Ct. at 1825–1826.

■ The plaintiff contends that she was dismissed from her employment on the basis of her being pregnant with a child, "a characteristic appertaining only to her sex" and that she was otherwise treated differently than white employees "to the employment disadvantage of the plaintiff". The Court does not agree with either of these contentions. As established by the evidence at trial, the motivating factor behind the discharge of the plaintiff was not that she was female, nor that she was pregnant, nor that she was black, but rather was due to plaintiff's expressed intent to represent to her youth groups a philosophy and social concept contrary to those of her employer and in violation of her agreement to espouse the Purpose and philosophy of the YWCA.

### The Sex Discrimination Charge

In the instant case, considering the nature of the YWCA as an organization of females working to provide for the social, educational, recreational, and religious needs of females, it is difficult to conceive of a cognizable claim of sex discrimination being made against it by a female employee. This Court notes from the evidence presented at trial that the entire National Board of Directors of the YWCA is comprised of women; that all of the officers and members of the Charlotte YWCA Board of Directors are women; that, as stated in the local President's Report for 1978, "the history of the YWCA is a proud experience of volunteers and staff working together to deliver programs to *women* and *girls,*" (emphasis added); and that defendant's employment manual refers to the employees exclusively by the use of feminine pronouns. In such an organization as this, it is truly difficult to see how plaintiff could establish, in her sex discrimination charge, that similarly situated male employees were or would be treated differently. Indeed, other than the allegation that there might be one male swimming coach and male maintenance personnel, there was no evidence offered at trial that the defendant YWCA has hired or will in the future hire, male employees to counsel or direct young women and girls in activities similar to those directed by the plaintiff. Obviously if the defendant had a policy to exclude employees from employment because of their sex or pregnancy, very few women would be eligible to be employed by this female organization, be they wed or unwed.

However, whether or not an organization operated predominantly by and for females is legally incapable of employment discrimination against females is a novel question this Court does not decide. Under Title VII, and its attendant regulations and caselaw, this Court finds that plaintiff has established a *prima facie* case of employment discrimination based on her sex. According to her testimony at trial, plaintiff was dismissed from her position merely because she was pregnant, an act prohibited by law. 42 U.S.C. § 2000e–2, *et seq.,* as amended 1972, 1978; 29 C.F.R. § 1604.10(a), 1972. Having proved her *prima facie* case of discrimination in employment based on sex, the burden thereupon fell upon the defendant to prove a legitimate nondiscriminatory reason for her dismissal, or a legitimate business purpose for the dismissal even if a discriminatory effect resulted. This Court holds that the defendant, YWCA, did so meet its burden.

As established by the testimony of Ms. Riddick, the Executive Director of the YWCA and the officer with ultimate authority to hire and dismiss employees; Ms. Reyburn, plaintiff's immediate supervisor in the Hoskins Community project; and Mrs. Harkey, chairman of the Personnel Committee, board member, and subsequent President of the Charlotte YWCA; the decision to dismiss plaintiff was premised upon plaintiff's stated intent to offer herself, in her condition of unwed pregnancy, as an "alternative lifestyle" role model to the young women and girls in her community project. As seen by her employer, this course of conduct and philosophy is contrary to the Purpose and philosophy of the

YWCA and violated plaintiff's agreement to espouse these principles in her employment.

It is not this Court's purpose or function to determine whether the morals of the plaintiff were good or bad or whether her decision to engage in extramarital affairs and conceive a child was right or wrong. See e.g., Dolter v. Wahlert High School, 483 F.Supp. 266, 270 (N.D.Iowa 1980). However, it is this Court's function to decide whether under the law the defendant would be required to retain in its employment a person who has made a conscious decision to bear a child while unwed and who felt that she could advocate or otherwise represent to the teenagers in the program she developed and maintained under the auspices of the defendant, an "alternative lifestyle" that is incompatible with the principles and goals of the defendant YWCA.

This Court is not willing to require that an organization such as the YWCA, which according to the evidence is a movement rooted in the Christian faith, and which has ideals and goals to which the plaintiff apparently does not subscribe, to employ a person to teach teenagers in a program under its auspices "an alternative lifestyle", a lifestyle which is abhorrent to the ideals and goals of the defendant YWCA. The facts in this case are entirely different than those cited by the plaintiff, among those being Crawford v. Cushman, 531 F.2d 1114 (2nd Cir. 1976); Andrews v. Drew Municipal Separate School District, 507 F.2d 611 (5th Cir. 1975); Doe v. Osteopathic Hospital of Wichita, Inc., 333 F.Supp. 1357 (D.Kansas 1971); Bolseco v. Bank of Hawaii, 19 FEP Cases 1637 (D.Hawaii 1978); Davis v. American National Bank, 12 FEP Cases 1052 (N.D.Texas 1971); and Jacobs v. Martin Sweets Company, Inc., 550 F.2d 364 (6th Cir.), cert. denied, 431 U.S. 917, 97 S.Ct. 2180, 52 L.Ed.2d 227 (1977). None of these cases involved an employee seeking actively to represent the social concept of unwed pregnancy to young females in violation of the stated philosophy and goals of the organization.

Andrews v. Drew Municipal Separate School District, supra, although superficially similar to the present case because it involved a teacher/student relationship, is distinguishable on its facts. The Court in Andrews found it unlikely that elementary school age children would be able to infer from the simple fact of their teacher's pregnancy that she was unmarried and therefore somehow immoral. 507 F.2d 616–17. In the present case, the defendant organization was reacting to plaintiff's stated intent to offer a role model of unwed pregnancy to her youth groups. Further, the YWCA has not created an irrebuttable presumption of immorality by the fact of unwed pregnancy, requiring dismissal as did the public school system in Andrews by its so-called "Pettey Rule." Rather, the YWCA has a stated legitimate philosophy and mission in its service to young women and girls, a mission and philosophy which plaintiff voluntarily agreed to espouse. However, she then later asserted her intent to espouse a contrary philosophy. Jacobs v. Martin Sweets Co. and Doe v. Osteopathic Hospital of Wichita, Inc., supra, in which private employers dismissed unwed pregnant employees, are also easily distinguished from the present situation. In those cases, the courts specifically found that the condition of unwed pregnancy had no rational relationship to the normal operation of the businesses. 550 F.2d at 371, 333 F.Supp. 1362. To the contrary, the circumstances of plaintiff's position as an adult organizer of community youth groups and her agreement to espouse the goals and philosophy of the YWCA to young women and girls certainly establishes a rational relationship between the requirements of her employment and the fact of her unwed pregnancy and her stated desire to advertise her condition as a role model.

This Court finds further authority to support the defendant in this case in McConnell v. Anderson, 451 F.2d 193 (8th Cir. 1971), cert. denied, 405 U.S. 1046, 92 S.Ct. 1312, 31 L.Ed.2d 588 (1972), and Hollenbaugh v. Carnegie Free Library, 436 F.Supp. 1328 (W.D. Pa.1977), aff'd, 578 F.2d 1374 (3rd Cir.), cert. denied, 439 U.S. 1052, 99 S.Ct. 734, 58

L.Ed.2d 713 (1978). *McConnell* and *Hollenbaugh* both involved homosexuals whose publicized lifestyles resulted in their dismissal from employment. Both courts upheld the dismissals on the grounds that the employers were being placed, against their will, in a position of tacitly approving to the general public the social concept of homosexuality as publicized by the employees themselves.

The present case is not simply a matter of an employer making a moral judgment regarding an unmarried pregnant employee. It is a case in which the employee sought to remain in the employ of the defendant on her own terms; a case in which the employee intended to pursue an activist role in implementing her unconventional ideas concerning societal status to be accorded unmarried mothers and thereby to foist tacit approval of this status upon an organization to which such conduct is contrary to its goals and principles; in this instance, the Young Women's Christian Association. The Court is not aware of any constitutional fiat or binding principle of decisional law which requires an employer such as the defendant to accede to such demands.

Therefore this Court concludes that the defendant YWCA dismissed plaintiff from employment solely on the basis of legitimate, nondiscriminatory reasons. As to the final burden on the plaintiff to show that defendant's reasons were merely a pretext to disguise an otherwise discriminatory intent, this Court finds that the plaintiff has failed to make the required showing. This Court notes again the overwhelming female composition of the YWCA and the great unlikelihood that its female officers would seek to establish pretextual reasons to discriminate against a female. Having observed the demeanor, and considered the credibility, of all the witnesses that testified during the trial, this Court finds no persuasive evidence in the record that the YWCA's reasons for dismissal were merely a pretext.

### The Racial Discrimination Charge

Turning to plaintiff's contention that she was terminated because she was black, the plaintiff relies on the fact that two white women were being allowed to continue working while pregnant. The difference of course is that these two women were married and had not offered to present alternative lifestyle role models of unwed pregnancy to young women and girls. The plaintiff then contends that there were five women who were unwed while pregnant and that only the plaintiff was terminated. The fact is, of course, that of the five, four were black and the three black women other than the plaintiff, held clerical positions and were not responsible for developing community programs nor counselling. One other white woman was a swimming instructor. She was not responsible for developing community programs, nor counselling, nor was she advocating an alternative lifestyle as plaintiff desired to do. Further, the swimming instructor was employed by the defendant after her child was several years old, and the defendant did not know of her status as an unwed mother until the time of this trial.

Thus, the plaintiff was treated differently than the other unwed mothers employed by the YWCA but not because she was black, but because the circumstances involving the other women and the plaintiff were entirely different. The other women did not have personal contacts with the youth groups which the plaintiff did; the other women were not involved in developing community social programs for youths; the other women were not intent on representing to the youth groups a moral and religious philosophy which was the antithesis of the philosophy and values of the employer, the YWCA; nor did the other women wish to present to the young people in the programs an alternative lifestyle.

In the Court's opinion, the plaintiff has not made out a *prima facie* case of discrimination based on race, as the evidence shows that defendant employed other black, unwed mothers. In any event, neither the black nor the white unwed mothers had been employed by the defendant in sensitive positions of directing community programs for young women and girls.

The defendant has met its burden of articulating a legitimate nondiscriminatory reason for terminating the plaintiff when she proposed to offer an alternative life-style role model in programs under the auspices of the defendant YWCA and in direct conflict with both the moral and religious philosophy of the defendant and her agreement to espouse that philosophy in her employment. *McConnell v. Anderson*, and *Hollenbaugh v. Carnegie Free Library*, *supra*.

In the Complaint, the plaintiff alleged violations of the 13th Amendment to the United States Constitution and of 42 U.S.C. § 1985 (1970) providing for relief from conspiracy to deprive persons of their civil rights and of 42 U.S.C. § 1988 (1970) providing for protection of all persons in their civil rights. These causes of action were not pursued by the plaintiff at trial and the evidence does not support claims of violations of these statutes.

In accordance with the above findings of fact and conclusions of law,

IT IS ORDERED AND DECREED that judgment be entered for the defendant and that the plaintiff's cause of action be dismissed, and that the costs, not to include attorney's fees, be assessed by the Clerk against the plaintiff.