Jeanne ECKMANN and Gregory Eckmann, a minor by Jeanne Eckmann, his Mother and Next friend, Plaintiffs,

v.

BOARD OF EDUCATION OF HAWTHORN SCHOOL DISTRICT NO. 17; John O'Brien; Norman Schossow; Mary Shafer; Richard Stermer; Jim Stuntz; Kenneth Dillenberg; Claudia Chamberlain; and George Platt, Defendants.

No. 82 C 20101.

United States District Court, N.D. Illinois, W.D.

May 19, 1986.

Edward F. Diedrich, DeKalb, Ill., for plaintiffs.

John R. Wienold, Aurora, Ill., Jan H. Ohlander, Rockford, Ill., George Krippner, Geneva, Ill., Ralph Miller, Chicago, Ill., for defendants.

## ORDER

ROSZKOWSKI, District Judge.

Before the court are defendants' motions for a judgment notwithstanding the verdict ("JNOV") or, alternatively, for a new trial or amended judgment. For the reasons stated herein, defendant Board of Education of Hawthorn School District No. 17's motions for a JNOV and for a new trial are denied. The School Board's motion for an amended verdict is granted. The compensatory damages awarded against the School District are remitted to $750,000.

The motions for JNOV of Board members John O'Brien, Norman Schossow, Mary Shafer, Richard Stermer, Jim Stunz, and Claudia Chamberlain are denied. The Board members' motions for a new trial are conditionally granted pending a conference on remittitur on May 27, 1986, at 10:00 a.m.

## I. BACKGROUND

On June 6, 1982, plaintiff Jeanne Eckmann instituted this civil rights action against the Board of Education of Hawthorn School District No. 17 (the "School Board") and various School Board members. Plaintiff sought compensatory and punitive damages for her allegedly unconstitutional discharge. On July 2, 1985, following a three week jury trial, a verdict was returned against the School Board for $2,000,000 in compensatory damages. Punitive damages were awarded against the Board members in the following amounts: $250,000 against John O'Brien; $25,000 against Norman Schossow; $10,000 against Mary Shafer; $500,000 against Richard Stermer; $25,000 against Jim Stunz; and $500,000 against Claudia Chamberlain.

On July 12 defendants filed the instant motions.

## II. DISCUSSION

### A. THE SCHOOL BOARD'S MOTIONS

#### 1. PLAINTIFF'S CONSTITUTIONAL CLAIM

As a preliminary matter, despite the numerous contentions raised by defendants' post-trial motions,[1] they do not challenge either the constitutional basis for plaintiff's claim or the jury instructions in that regard. A review of these critical portions of this case is helpful however for a full understanding of this court's present decision.

The burden of proof instruction tendered to the jury in this case was drafted according to the dictates of *Mount Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *Mount Healthy* involved a challenge by a non-tenured teacher to a school board decision not to renew his teaching contract. The teacher in *Mount Healthy* brought an action claiming that the school board had based its decision on unconstitutional factors. The school board asserted that the teacher was fired for arguing with other teachers and school employees, swearing at students and making obscene gestures at female students. In other words, the school district contended that the teacher would not have been rehired even if the constitutionally protected incident had not occurred.

The trial court in *Mount Healthy* had utilized a rule of causation that focused *solely* on whether the constitutionally protected conduct had played a "substantial part" in the school board's decision. Other valid reasons which also may have motivated the board were thus disregarded. The Supreme Court, in a rare unanimous decision, rejected this over-simplified rule of causation, choosing instead "a test of causation which distinguishes between a result caused by a constitutional violation and one not so caused." *Mount Healthy*, 429 U.S. at 286, 97 S.Ct. at 575.

> Initially ... the burden [is] properly placed upon [the teacher] to show that his [or her] conduct was constitutionally protected, and that this conduct was a "substantial factor"—or, to put it in other words, that it was a "motivating factor" in the Board's decision not to rehire ....[T]he Board [must then show] by a preponderance of the evidence that it would have reached the same decision as to [the teacher's] reemployment even in the absence of the protected conduct.

Under this test of causation school teachers cannot prevent school boards from making unfavorable employment decisions

---

1. Defendants raise approximately 50 alleged trial errors requiring a ruling in their favor. The vast majority of these alleged errors, even if meritorious, would not warrant either a JNOV or a new trial. This order will only deal with the most significant of defendants' allegations.

merely by engaging in constitutionally protected conduct. *Id.* at 286, 97 S.Ct. at 575.

■ Based on *Mount Healthy,* there are three burdens in a case of this sort. The teacher must first show some constitutionally protected conduct. Once this is established, the teacher carries the burden of showing that the protected conduct was a "substantial" or "motivating" factor behind the school board's conduct. Once the teacher carries these two burdens the school board must then show by a preponderance of the evidence that it would have taken its action even if the teacher had not engaged in the constitutionally protected conduct. *Knapp v. Whitaker,* 757 F.2d 827, 845 (7th Cir.1985). The fact that the school board *could* have reached the same decision is not enough; the board must show that it in fact *would* have reached the same decision without considering the teacher's protected conduct. *See Johnson v. Lincoln University,* 776 F.2d 443, 455 (3d Cir.1985).

The constitutionally protected conduct plaintiff alleges motivated the School Board to fire her in this case was her out-of-wedlock pregnancy coupled with her decision to raise her child as a single parent. While plaintiff's conduct is not protected by a specifically enumerated constitutional right, this court considered it to be covered by "substantive due process."[2]

In *Regents of the University of Michigan v. Ewing,* —— U.S. ——, 106 S.Ct. 507, 513–14, 88 L.Ed.2d 523 (1985) (quoting *Moore v. East Cleveland,* 431 U.S. 494, 543–544, 97 S.Ct. 1932, 1958, 52 L.Ed.2d 531 (1977) (White, J., dissenting)), the Supreme Court recently stated:

"[T]he substantive content of the [due process] clause is suggested neither by its language nor by preconstitutional history; that content is nothing more than the accumulated product of judicial interpretation of the Fifth and Fourteenth Amendments".

The risks associated with judicially enhanced protection for certain unenumerated substantive liberty protections " 'counsels caution and restraint'." *Id.* at 515, 97 S.Ct. at 1943–44 (Powell, J., concurring) (quoting *Moore, supra* ). Courts must be "careful to examine each asserted interest to determine whether it 'merits' the protection of substantive due process". *Id.* (citing cases).

In *Toney-El v. Franzen,* 777 F.2d 1224, 1227 (7th Cir.1985), the Seventh Circuit recently noted:

" 'Substantive due process' is a shorthand [expression] for the fact that the Supreme Court has interpreted the due process clause of the Fourteenth Amendment to confer certain substantive rights based mainly on the Bill of Rights." *Brown v. Brienen,* 722 F.2d 360, 366 (7th Cir.1983). Those substantive rights include the specific guarantees in the Bill of Rights as well as "penumbras, formed by emanations from those guarantees that help give them life and substance." *Griswold v. Connecticut,* 381 U.S. 479, 484 [85 S.Ct. 1678, 1681, 14 L.Ed.2d 510]. (1965).

The "penumbras" referred to in *Griswold* embody:

" 'a conception of fundamental justice.' ... [They] protect[ ] against state transgression only those personal immunities that are 'implicit in the concept of ordered liberty,' ... leaving a state 'free to regulate the procedure of its courts in accordance with its own conception of policy and fairness, unless in so doing it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' "

*Id.* (quoting *Sotto v. Wainwright,* 601 F.2d 184, 190–91 (5th Cir.1979) (citations omitted)). Those "fundamental rights" that are "implicit in the concept of ordered liberty" include:

"the right[ ] to vote, ... the right of association, ... the right of access to the

---

**2.** It is important to note that this case in no way involves "procedural" due process. Plaintiff was provided with adequate post-termination hearings. Indeed, she was ultimately reinstated as a result of these hearings.

courts, ... *and assorted freedoms against state intrusion into family life and intimate personal decisions, ....*"

*Id.* (emphasis added).

■ In *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010 (1967), the Supreme Court held that the freedom to decide whom "to marry, or not marry ... resides with the individual and cannot be infringed by the state." In other words, it is improper for the state to interfere with a person's decision to marry, or as it relates to this case, *not* to marry. The Supreme Court later stated that:

If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.

*Eisenstadt v. Baird*, 405 U.S. 438, 453–54, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972) (emphasis in original). The next year, in *Roe v. Wade*, 410 U.S. 113, 153, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973), the Court held that the constitutional right to privacy "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." Supreme Court precedent thus clearly shows that the individual's decisions regarding marriage and child bearing are constitutionally protected from improper state infringement. *See Paul v. Davis*, 424 U.S. 645, 713, 96 S.Ct. 1154, 1166, 47 L.Ed.2d 366 (1976) ("matters relating to marriage, procreation, contraception, family relationships, and child rearing and education" are constitutionally protected by "substantive aspects of the Fourteenth Amendment"). Under the overwhelming weight of this authority, it is beyond question that plaintiff had a substantive due process right to conceive and raise her child out of wedlock without unwarranted state (School Board) intrusion.[3]

## 2. JUDGMENT NOTWITHSTANDING THE VERDICT

■ In its motion for a JNOV, the School Board does not contest that plaintiff's out-of-wedlock pregnancy and her decision to raise her son as a single mother are protected by substantive due process. Rather, the School Board focuses its attack on whether plaintiff showed that her conduct in fact motivated the Board when discharging her. In a nutshell, the School Board's position is that:

In this case a review of all of the evidence taken as a whole, in the light most favorable to the plaintiff *without speculation or drawing unreasonable inferences* which conflict with undisputed facts clearly shows that beyond any doubt the Defendant School Board would have taken the same action against the Plaintiff if the language referencing immorality had never been included in the documentation.

School Board's Brief in Support at 3. (emphasis in original)

To support its position, the School Board states that "[e]very witness called by the Plaintiff or the Defendant testified that the Board would have taken the same action even without the immorality language." School Board's Brief at 3. The School Board then provides a capsulized summary of each Board member's testimony in addition to the testimony of the Board's lawyer.

This court agrees with the School Board that each Board member specifically testified that plaintiff would have been terminated even if she had not been pregnant. This court also agrees that each Board member testified that the *only* reason charges of "immorality" were included in plaintiff's "Notice to Remedy", "Letter of Dismissal" and the accompanying Bill of Particulars, was on advice of the Board's lawyer. The Board's lawyer confirmed this testimony. This court also recalls the nu-

---

**3.** *See Drake v. Covington County Board of Education*, 371 F.Supp. 974, 979 (M.D.Ala.1974) (three judge court) (state violated plaintiff's constitutional right of privacy by basing cancellation of employment contract on evidence of her unwed pregnancy). *See also Andrews v. Drew Municipal Separate School District*, 507 F.2d 611 (5th Cir.1975)., *cert. dismissed*, 425 U.S. 559, 96 S.Ct. 1725, 48 L.Ed.2d 169 (1976) (school board rule denying employment to unwed parents violates equal protection; invasion of privacy issue left open).

merous defense witnesses that testified as to "the cruelty, abuse, disregard and other difficulties that they had with [plaintiff] from 1979 until the time of dismissal." School Board's Brief at 5.

What the School Board overlooks however (at least until plaintiff raises these points in her memorandum) is that plaintiff did present evidence that her supposed "immorality" was the motivating factor for her discharge.

For example, plaintiff submitted the "Notice to Remedy" given her by the School Board. The Notice listed numerous charges of deficiencies in plaintiff's teaching abilities and stated that there were 11 matters that could be remedied. One such charge was:

> Your conduct in becoming pregnant outside the state of marriage has diminished your ability to teach and the ability of your students to learn their lessons from you.

The Notice then cautioned plaintiff "not to engage in such conduct in the future".

Plaintiff also presented Administrative Law Judge Sidney Mogul's written report ordering her reinstatement with full back pay. The issue in front of ALJ Mogul was whether the School Board could prove by a preponderance of the evidence that plaintiff was guilty of "negligence, insubordination, cruelty and immorality" as charged in the "Letter of Dismissal." Following a lengthy hearing, ALJ Mogul issued a twenty-five page decision in which he found that:

■ "In support of the charge that the Teacher is an unfit role model, the Board has failed to show that the Teacher proselytized pupils or that the fact of childbirth out of wedlock had any substantial effect upon the Teacher's students". [p. 6];

■ "The Board has shown no evidence of significant harm to students, faculty or school, resulting from the Teacher's unwed motherhood." [p. 9); and,

■ "There is no evidence in the record that the Teacher was an immoral person. On the contrary, the record indicates that she was an eminently moral person, a religious person and staunch in her beliefs." [p. 4]

ALJ Mogul went on to note that "were it not for her pregnancy and childbirth out of wedlock, this dismissal would probably not have taken place," and that "the charges of negligence, insubordination or incompetency were purely embellishments to soften the effect of the Board's reliance upon its charge of immorality." ALJ Mogul also stated that "[t]he Board has failed to disprove the contention of the Teacher that its allegations are pretextual and that the Board would not have dismissed her without the immorality charges" and that "[t]he detailed recitation by the Board of relatively insignificant charges made by the Board against the Teacher are pretextual in nature...."

With respect to the charges of negligence and insubordination, the grounds which the School Board now state actually formed the decision to terminate plaintiff, ALJ Mogul found:

■ "There is no compelling evidence in the record that she was insubordinate or negligent." [p.13];

■ "Nowhere in the record is there any evidence to show that the Teacher failed to remedy any alleged negligence or insubordination with which she was charged by the Board." [p. 14]; and,

■ "Most certainly none of the remediation period incidents referred to [by the Board] were adequate proof to support the charges of negligence or insubordination." [p. 20]

While the School Board correctly points out that ALJ Mogul made factual findings not necessary to his decision—*e.g.* the various "findings" that the School Board's stated reasons were "pretextual"—this only goes to the collateral estoppel effect afforded his decision in this litigation. *See* Memorandum Opinion, July 18, 1985. While ALJ Mogul's findings did not bar litigation of the issues in this case, they

were relevant as evidence to support plaintiff's position that the charge of immorality actually motivated the School Board to dismiss her.

Also submitted was evidence to the effect that following the Notice to Remedy in July of 1981, the School Board voted to cut plaintiff's pay and instructed the superintendent to tell her that she could not longer manage the student council, coach the cheerleaders, organize school fund raisers or trips, or participate in graduation exercises. All of these restrictions were imposed because she was a mother.

Plaintiff also submitted an evaluation written by Board member Ed O'Brien to the effect that she was doing fine at school and that the quality of the teaching in her classroom was excellent. Plaintiff never received this evaluation. Mr. O'Brien mailed it to Board Attorney Weiler for approval. Attorney Weiler simply filed the letter away.

The School Board makes much of the fact that the immorality language was only used at the suggestion of Attorney Weiler. While this may have relevance with regard to the good faith of the Board members, the School Board as an entity enjoys no such immunity. *See Kentucky v. Graham*, — U.S. —, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). Also, the fact that the exact wording was included solely on advice of counsel and that the Board members may not have "liked" the language in no way precludes a jury determination that the Board members were motivated to action by the perceived "immorality" of plaintiff's conduct. It would be absurd for the School Board to even suggest that plaintiff's pregnancy and parenting decisions were not hotly debated topics within the Hawthorn School District.

Juries are not required to determine cases merely by weighing the number of witnesses and volume of testimony presented by each side. Were this so, the School Board would clearly have carried the day. Juries are allowed—indeed it is their task— to judge the credibility of witnesses and they are free to believe or disbelieve testimony as they see fit. The fact that the jury in this case chose to discredit the Board member's self-serving testimony and credit plaintiff's admittedly less-voluminous evidence does not require that its verdict be set aside.

The standard of review used in deciding a JNOV motion is highly deferential to the jury's verdict. *Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d 508, 512–13 (7th Cir. 1986). A motion for a JNOV is properly denied where:

> the evidence and all reasonable inferences, when viewed in the light most favorable to the party opposing the motion, is such that reasonable people in a fair and impartial exercise of their judgment may reach different conclusions.

*Watts v. Laurent,* 774 F.2d 168, 172 (7th Cir.1985) (citation omitted). "This standard implies that a [JNOV] should rarely be granted where the apparent correctness of the verdict turns on credibility determinations." *Id. See also McKinley v. Trattles,* 732 F.2d 1320, 1324 (7th Cir.1984).

> The credibility of the witnesses and the weight of the evidence are matters within the purview of the jury, especially in a case such as this which turns, in large measure, upon the defendants' motive in making certain decisions.

*Knapp v. Whitaker,* 757 F.2d 827, 843 (7th Cir.1985) (citation omitted).

Since the verdict in this case depended in large part upon the credibility of the Board member's testimony and since plaintiff presented sufficient evidence to support a jury verdict contrary to this testimony, the School Board's motion for a JNOV must be denied.

**3. NEW TRIAL**

The School Board in the alternative has moved for a new trial pursuant to Rule 59, Fed.R.Civ.P. The Board's new trial motion is "[b]ased upon the many improper remarks, improperly suggestive questions as well as the intentional and prejudicial remarks in the rebuttal portion of final argument...." School Board's Brief at 10.

The specific ground allegedly mandating a new trial is plaintiff's counsel's repeated injection of insurance into this case.

It is beyond question that the improper interjection of insurance into a lawsuit can form the basis for ordering a new trial. *See Cotter v. McKinney*, 309 F.2d 447 (7th Cir.1962). A review of the specific improprieties in this case, however, will show why a new trial is not warranted.

■ The first alleged impropriety occurred during plaintiff's counsel's redirect examination of Mr. Tom Deneen. The questioning and testimony went as follows:

Q. Mr. Deneen, the name of the [School Board's] lawyer was Wayne Weiler, is that correct?

A. Correct.

Q. And he is no longer the board lawyer, is he?

A. No.

Q. Were you on the board when his services were terminated or when they ended, as far as the Hawthorn School Board?

A. Yes. He was there until the insurance lawyers took—I mean, until this other group of lawyers took over.

Following Mr. Deneen's testimony, defense counsel moved for a mistrial. Plaintiff's counsel explained that he had never conferred with Mr. Deneen concerning this testimony and that Mr. Deneen's reference to insurance lawyers was totally inadvertant. After full argument on this point by counsel, this court stated:

I think its not that prejudicial. First of all, I think it was totally inadvertant on Mr. Deneen's part. Obviously, it wasn't the question, but is the sort of thing that the witness was liable to do, and I've had it happen to me on a number of occasions as a lawyer where—and I don't think it is grounds for a mistrial.

This court also stated to defense counsel, "if you want an instruction on it I'll be glad to give you an instruction on it at the close of the evidence; but I don't think it made much of an impact on the jury the way it came out". Importantly, defense counsel declined an invitation to voir dire Mr. Deneen, stating that "Your Honor, I feel confident that Mr. Deneen did not do it intentionally."

Mr. Deneen's clearly inadvertant reference to insurance in answering a proper question does not constitute grounds for a new trial.

Defendants also claim that "throughout the course of trial and particular, the final argument, Plaintiff's counsel continued to make reference to the fact that Wayne Weiler was not the attorney for the School Board anymore...." This, the Board argues, was also an improper attempt to insert insurance into this case and constitutes grounds for a new trial. This court disagrees.

In the first place, had plaintiff's counsel merely referred to "Mr. Weiler, the School Board's lawyer" the jury was likely to be confused as to whether he was referring to the School Board's trial lawyers or the Board's lawyer at the time plaintiff was fired. Also, in distinguishing between the School Board's past and present lawyers, plaintiff's counsel never used the word "insurance". Thus, at best the alleged allusions to insurance were extremely oblique. A few incidental remarks which at most indirectly refer to insurance during the course of a lengthy trial hardly mandate a new trial.

■ The most troubling insurance related interjection came during plaintiff's counsel's closing argument.

Now, you must be concerned, of course, with payment, that sort of thing. School boards, as we know, are comprised of individuals who, for several different reasons, whether it's politics, family, good desires to serve, form the school board. They're intelligent enough to hire lawyers like Mr. Weiler and counsel here. They're intelligent enough to collect the taxes, to levy the taxes, and get the right amount of taxes, hire the teachers, and to take care, as need they take care, to provide for the security of the buildings,

to provide for the security of the furniture, and that sort of thing to hire the maintenance staff, to make sure the building is safe and that if anything does happen to it, it can be rebuilt.

*We can only presume that school boards are able to take care of the business needs that may be required to take care of situations like this* of where a school board collapsed in the face of the community concern rather than doing its job as a government.

*So, I feel that we have no worries, that you should concern yourself about whether or how or when, if any, just judgment for punishment is collected,* but send the message to the school board.

At this point defense counsel objected. This court sustained the objection, struck the argument and instructed the jury to disregard it.

This court's feeling at the time the objection was sustained, as now, is that this was an improper attempt by plaintiff's counsel to inform the jury that the School Board was insured against damage actions and that they should therefore not worry about harming the School District by assessing a large damage award. There is absolutely no other explanation for this line of argument. This court finds incredible plaintiff's counsel's explanation that he:

merely stated to the jury that they should not be hesitant to award punitive damages because of any belief that plaintiff didn't have them coming as compensation or that defendant had not caused that much actual damage. The plaintiff explained to the jury that it need not be hesitant to award exemplary damages in a large amount against the persons of the School Board....

Plaintiff's Response at 13. Counsel's argument clearly went well beyond this stated purpose.

In *Cotter v. McKinney*, 309 F.2d 447 (7th Cir.1962), the Seventh Circuit reversed a jury verdict for a defendant based on his attorney's improper interjection of insurance during his closing argument. As in *Cotter*, "[w]e are faced with an argument to a jury made in a deliberate fashion by one skilled in the law, an attorney." *Id.* at 451. Unlike this case however, the attorney in *Cotter* made repeated references directly to insurance in an attempt to mislead the jury into believing a judgment could be rendered against another defendant/insurance company. *Id.* at 450. The insurance company had in fact already been released from liability by an earlier convenant not to sue. *Id.*

While the purpose of plaintiff's counsel's argument was to notify the jury of the School Board's insurance he never directly referred to insurance, instead choosing a more round-about argument. Given the indirect nature of plaintiff's argument combined with its brevity and the instruction to the jury to disregard it, this court does not feel that it warrants an order for a retrial of this case. As this court stated after plaintiff's counsel had finished his argument:

I'm going to deny the motion for a mistrial; however, I do think you came close to the edge there in those comments, and that's why I stopped you and instructed the jury to strike it and disregard it. I really don't think that they paid any attention to it, and I don't think it's grounds for a mistrial.

As a final basis for a new trial, the School Board argues that the verdict against it for $2,000,000 in compensatory damages "is based upon passion, prejudice, confusion and mistake". School Board's Brief at 13. The School Board suggests that the improperly-influenced verdict requires this court to order a new trial on both liability and damages.

The law is clear that a jury verdict that is the product of "passion and prejudice" is a sufficient ground to order a new trial. *See, e.g., Benson v. Allphin*, 786 F.2d 268, 280 (7th Cir.1986); *Ustrak v. Fairman*, 781 F.2d 573, 579 (7th Cir.1986). As stated by the Fifth Circuit however, "[a] jury's finding as to liability can be binding even though its monetary award is found to be excessive or even improperly influenced."

*Edwards v. Sears, Roebuck and Co.*, 512 F.2d 276, 282 (5th Cir.1975) (cited with approval in *McKinnon v. City of Berwyn*, 750 F.2d 1383 (7th Cir.1984)).

> If the passion, prejudice, caprice, undue sympathy, arbitrariness or more taints only the damage award and not the liability assessment, the proper response is a remittitur or a new trial addressed to damages alone.

*Id.*

As discussed previously, the jury determination as to liability in this case was not against the weight of the evidence. A new trial on liability is therefore not warranted. *See Foster v. Continental Can Corp.*, 783 F.2d 731, 735 (7th Cir.1985); *McKinley v. Trattles*, 732 F.2d 1320, 1327 (7th Cir.1984). Neither is a new trial on damages required in this case. Having observed the original trial, this court feels competent to properly calculate a remittitur. *See Knapp*, 757 F.2d at 847 (case remanded to trial court to recalculate compensatory damage award); *McKinley*, 732 F.2d at 1325–26 (reinstated punitive damage award; trial judge instructed to set remittitur).

### 4. REMITTITUR

■ The actual measurement of damages is an exercise of fact-finding that a court is not permitted to "second-guess" unless a review of the case leaves "a definite and firm conviction that a mistake has been committed." *Knapp*, 757 F.2d at 846 (quoting *Whitley v. Seibel*, 676 F.2d 245, 252 (7th Cir.), *cert. denied*, 459 U.S. 942, 103 S.Ct. 254, 74 L.Ed.2d 198 (1982)).

> "In determining whether an award is excessive, [courts] are to accord substantial deference to the decision of the jury and [should] not disturb an award unless ... convinced that it is 'monstrously excessive' or 'so large as to shock the conscience of the court.'"

*Id.* (quoting *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1275 (7th Cir.1983) (citing cases)).

The jury's decision to "compensate" plaintiff by awarding her $2,000,000 against the School Board can only be labeled as "monstrously excessive". As stated by the Seventh Circuit in *Knapp:*

> A public school teacher may recover compensatory damages, under 42 U.S.C. § 1983, for out-of-pocket expenses, mental and emotional distress, community humiliation, and loss of professional reputation....

757 F.2d at 847 (citations omitted). The evidence in this case in no way supports such a large verdict.

In his final argument in this case, plaintiff's counsel stated to the jury:

> [y]ou are being asked today by the plaintiff to rule on something that will have resounding effect upon all school boards in the United States. We seek not just the recovery of the $46,000, the thirty some thousand she has in doctor bills and hospital bills, and the back wages, we seek pain and suffering damages for her for the real pain that the doctor told you of $500,000 on top of the $31,000.

Plaintiff's counsel then immediately went on to ask the jury to "punish the school board for the way it behaved. And we ask that you punish them in the amount of 5 million dollars."

While this court, pursuant to a defense objection, required plaintiff's counsel to correct any mistaken notion he may have conveyed to the jury that they could award punitive damages against the School Board as an entity, it is obvious from the verdict they ultimately returned that the jury in fact was punishing the School Board. While the exact dollar amount of compensatory damages requested by plaintiff's counsel is somewhat confusing, he never asked for an amount even approaching $2,000,000. This court is fully aware that plaintiff is not limited to the amount of damages requested in argument. The amount awarded however must bear at least some relationship to the evidence presented at trial. In this court's opinion, $750,000 will more than adequately serve to compensate plaintiff for the injuries she suffered in this case. The damage award against the School Board is remitted accordingly.

In *McKinnon v. City of Berwyn*, 750 F.2d 1383–91 (7th Cir.1984), the court stated:

> the [district] judge abused his discretion in finding the damages excessive ... without giving the plaintiff the option of a new trial in lieu of the remittitur.

*Id.* at 1391. Other cases have also indicated that plaintiffs must be given the option of a new trial if they choose not to accept a remittitur. *See, e.g., Ustrak,* 781 F.2d at 579; *Joan W. v. City of Chicago,* 771 F.2d 1020, 1025. Should plaintiff choose not to accept the remittitur, then, she will be allowed a new trial as to damages.

## B. THE SCHOOL BOARD MEMBERS' MOTIONS

### 1. JUDGMENT NOTWITHSTANDING THE VERDICT

■ The jury assessed punitive damages against the individual School Board members in varying amounts. In each of their motions for JNOV, the Board members argue that during trial this court granted a directed verdict dismissing them in their "individual" capacities as that term applies to Section 1983 cases. The Board members assert that they remained in the case from that point on solely in their "official" capacities. The Board members conclude that plaintiff was therefore precluded from recovering punitive damages against them.

Were the School Board members correct in their interpretation of this court's ruling, punitive damages would indeed have been improper. Once the Board members were no longer in this action in their "individual-capacities", only the School Board as a municipal entity would have remained. *See Kentucky v. Graham.,* —— U.S. ——, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Brandon v. Holt,* 469 U.S. 464, 105 S.Ct. 873, 877, 83 L.Ed.2d 878 (1985). The Supreme Court's ruling in *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), would then have precluded a punitive damage award.

In arguing for a directed verdict on behalf of the Board members in their "indi-vidual" capacities, defense counsel stressed that:

> There has been no evidence that they [the Board members] acted other in their official capacity.... All of [the actions of the Board members] were done in the official capacity of these individuals acting as a board. I see no evidence of any unofficial action or any individual action by any member....

While this court agreed that none of the acts complained of took place outside of the Board Member's official duties and directed a verdict to that extent, this ruling never removed the technical Section 1983 "individual-capacity" liability of the Board members.

Noting that the distinction between personal and individual capacity suits "continues to confuse lawyers and confound lower courts", the Supreme Court recently defined more clearly the "practical and doctrinal differences between personal and official capacity actions." *Graham,* 105 S.Ct. at 3105.

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law ....
>
> Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." ... As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as suit against the entity.... It is *not* a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

*Id.* (citations and footnotes omitted).

Establishing "individual" liability in a Section 1983 action is relatively straight forward:

On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the officials, acting under color of state law, caused the deprivation of a federal right....

*Graham*, 105 S.Ct. at 3106 (citation omitted) (emphasis in original). To establish liability against the governmental entity in an "official-capacity" suit, more is required.

[A] governmental entity is liable under § 1983 only when the entity itself is a "moving force" behind the deprivation.... Thus, in an official-capacity suit, the entity's "policy or custom" must have played a part in the violation of federal law....

*Id.* (citations and footnote omitted).[4] *See also Duckworth v. Franzen*, 780 F.2d 645, 649 (7th Cir.1985).

In this case, the Board members violated plaintiff's substantive due process rights by firing her based on the "immorality" of having and raising a child out of wedlock. It is precisely these unconstitutional "under of color of state law" actions which give rise to their Section 1983 "individual" liability. Defense counsel's own arguments support a finding of "individual" liability.

The only importance of this ruling is whether the jury would be allowed to consider awarding punitive damages against the Board members. Any confusion which might have resulted from the directed verdict ruling was thus clarified when the jury was instructed that they could award punitive damages against the individual Board members. Under the law governing Section 1983 actions such as this one, the only way that punitive damages could have been awarded was if the Board members in fact remained in this suit—as was proper—in their "individual" capacities.

The jury was instructed that they could award punitive damages against the Board members if they showed "reckless or callous disregard of, or indifference to plaintiff's federally protected rights." This punitive damages instruction exactly tracked the standard set forth in *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). The punitive damages issue was thus properly submitted to the jury and in no way requires a JNOV.

█ The Board members also argue that judgment should be entered in their behalf due to the failure to instruct the jury on qualified immunity. A review of the defense of good faith immunity will show why it would have been error for this court to place the issue in front of the jury for determination.

In *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Supreme Court established a broad immunity for local school board officials.

It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion.... The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members....

*Id.* at 326, 95 S.Ct. at 1003. Damage awards were considered appropriate only where the board members have "acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that [their] action cannot reasonably be characterized as being in good faith." *Id.* at 322, 95 S.Ct. at 1001. The *Wood* immunity test had both subjective and objective prongs.

In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the

---

**4.** Regarding defenses available in these suits, the *Graham* Court stated:

When it comes to defenses to liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses, such as objectively reasonable reliance on existing law....

In an official-capacity action, these defenses are unavailable.... The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment....

105 S.Ct. at 3105. (citations omitted).

**1226**

Supreme Court discarded the subjective prong of good faith immunity. Under *Harlow,* the test used in determining qualified immunity boils down to whether the state officials' conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. The stated purpose for adopting a purely objective test was to prevent "insubstantial" claims from proceeding to trial by removing the need for a jury determination of the motives of the state officials. *Id.* *See Pollnow v. Glennon,* 757 F.2d 496, 500–501 (2d Cir.1985).

In *Mitchell v. Forsyth,* — U.S. —, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court recently decided that district court orders denying an official the defense of qualified immunity are immediately appealable. In making this determination, the *Mitchell* court stressed that proper application of the purely objective test established in *Harlow* is important:

> To avoid "subject[ing] government officials either to the costs of trial or to the burdens of broad reaching discovery" in cases where the legal norms the officials are alleged to have violated were not clearly established at the time.

*Id.* at 2815–16 (quoting *Harlow,* 457 U.S. at 817–18, 102 S.Ct. at 2738). Under *Harlow:*

> Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.... Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts.

*Id.* at 2816. The *Mitchell* Court emphasized that *Harlow* recognized qualified immunity as "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* (emphasis in original).

The *Mitchell* Court determined that the qualified immunity issue was "conclusively determined" by a denial of a motion for dismissal or for summary judgment. In some cases, denial of a qualified immunity motion represents:

> the trial court's conclusion that even if the facts are as asserted by the defendant, the defendant's actions violated clearly established law and are therefore not within the scope of the qualified immunity. In such a case, there will be nothing in the subsequent course of the proceedings in the district court that can alter the court's conclusion that the defendant is not immune.

105 S.Ct. at 2816. The trial court may also deny a qualified immunity motion in situations where:

> if the facts are as asserted by the plaintiff, the defendant is not immune. At trial the plaintiff may not succeed in proving his version of the facts and the defendant may thus escape liability.

*Id.*

Based on *Harlow* and its interpretation in *Mitchell* it is clear that the question of the Board member's qualified immunity was properly reserved for the court, not the jury. *See Benson,* 786 F.2d at 274 ("the question of qualified immunity is addressed to the court, not the jury."). *See also H.C. v. Jarrard,* 786 F.2d 1080, 1089 (11th Cir.1986) (determination as a matter of law that no reasonable person would not know they were violating plaintiff's clearly established constitutional rights); *McKinley,* 732 F.2d at 1324 (jury instructions on good faith immunity erroneously given; immunity is a question of law for the judge to decide).[5]

The present case falls within the second "conclusive" situation mentioned in *Mitch-*

**5.** It is unnecessary for purposes of this opinion to determine if the issue of qualified immunity should ever be submitted to a jury.

*ell:* denial of qualified immunity due to controverted facts asserted by plaintiff. The question here was not whether the law was well-settled that school boards cannot fire school teachers based on a teacher's decision to forego an abortion and raise a child as a single parent; as shown above, the law in this area was clear long before the School Board terminated plaintiff. Rather, the question in this case narrows quite simply to whether or not these actions by plaintiff in fact motivated the Board to fire her. Since plaintiff was able to submit some evidence to support her version of the case, the defense of qualified immunity was not available to the School Board members. Having at least arguably violated a clearly established constitutional right of plaintiff, the Board members lose the benefits of a qualified immunity—"immunity from suit"—and are forced to proceed to trial to test the merits of the plaintiff's claims.

The qualified immunity issue shares some factual overlap with the merits of a case. As recognized by the dissent in *Mitchell:*

> Although the qualified immunity question ... is not identical to the ultimate question on the merits, the two are quite closely related. The question on the merits is whether the government official [violated the law when taking the complained of action]. The immunity question is whether [the government official] violated *clearly established law* when taking the complained of action].

105 S.Ct. at 2825 (Brennan, J. dissenting). The majority also recognized the factual overlap, differing only with the minority's conclusion that this overlap prevented interlocutory appeal.

> The reason is that the legal determination that a given proposition was not clearly established at the time the defendant committed the alleged acts does not entail a determination of the "merits" of the plaintiff's claim that the defendants' actions were in fact unlawful.

*Id.* at 2817 n. 10.

The inescapable conclusion from *Mitchell* is that it was proper for the *court* to determine that the Board members had arguably violated plaintiff's clearly established substantive constitutional rights leaving only the truth of plaintiff's allegations (the merits issue) to the jury.

That the Board members may have relied on the advice of Attorney Weiler when including the immorality language is legally irrelevant to the issue of qualified immunity. The fact that the law governing deprivations based on child rearing decisions was well-settled long before the Board's decision necessarily implies that objectively reasonable persons would have been aware of it. This would include *both* Attorney Weiler *and* the Board members as persons legally chargeable with knowledge of well-settled law.

In arguing that they should not be held liable for actions taken with advice of counsel, the Board members in essence argue the merits underlying plaintiff's case. Had the School Board convincingly shown that considerations of plaintiff's morality did not play a "substantial" or "motivating" part in the decision to discharge her, as *evidenced* by the fact that the immorality language was included on advice of Attorney Weiler, it would have successfully rebutted plaintiff's prima facie case. The School Board was permitted to fully argue its position that it acted on advice of Attorney Weiler. The jury was merely unconvinced that immorality did not in fact motivate the Board's decision, with or without Attorney Weiler's advice.

Qualified immunity protects government officials only in cases where it cannot be said that their actions violated rights clearly established at the time that they acted. While government officials are not held liable for their failure to properly predict the course of the law, they are liable for their acts performed in contravention of well-settled law. Since the Board members (along with Attorney Weiler) acted in violation of plaintiff's clearly established substantive due process rights, the defense of qualified immunity was not available to them.

**1228**

The Board members' arguments for a JNOV are thus without merit and are denied.

## 2. NEW TRIAL AND REMITTITUR

 As with the School Board, this court feels that a new trial on liability for the individual Board members is not warranted. While the standard for individual liability is higher, requiring a finding that the Board members acted with "reckless or callous disregard of, or indifference to, plaintiff's federally protected rights", plaintiff has submitted sufficient evidence from which a reasonable jury could make such a finding.

The various amounts of punitive damages assessed is another matter. The radically different amounts awarded against the individual defendants stands as a clear indication that the jury was confused when awarding punitive damages. The most glaring example is the $250,000 that the jury awarded against John O'Brien even though it is undisputed that he was one of two Board members that voted *against* plaintiff's dismissal.

In actions brought under Section 1983, punitive damages should be awarded based on an official's "personal financial resources." *Perrin v. Anderson,* 784 F.2d 1040, 1048 (10th Cir.1986) (quoting *City of Newport,* 453 U.S. at 269, 101 S.Ct. at 2761). It is therefore conceivable that multi-defendant Section 1983 actions can result in punitive damage awards in varying amounts based on the relative wealth of each defendant. Since there was no testimony in this case concerning each defendant's financial resources, however, the widely differing punitive damage awards cannot be attributed to this factor.

Under the law governing the amount of punitive damages, a court must reject the amount determined by a jury "if it exceeds what was required to serve the objectives of deterence and punishment." *McKinley,* 732 F.2d at 1327 (citation omitted). An amount that " 'might result in a windfall' to the plaintiff" or that exceeds " 'the necessary and permissable level of punishment and deterence' " is improper and must be reduced. *Id.* (citation omitted). *See also Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d 508, 514 (7th Cir.1986). In altering a jury determination as to the proper amount of punitive damages, courts are to "exercise [their] discretion in setting an amount which will best serve the important goals of punitive damages without unduly hampering the necessary functioning of the [governmental entity]." *Id.*

As in *McKinley,* the proper way to proceed in this case is to grant the Board members' motions for a new trial as to the amount of punitive damages, "subject to plaintiff's right to accept ... an award, set by the district court...." 732 F.2d at 1328. The Board members' motions for a new trial are therefore granted, conditioned on plaintiffs' acceptance of a remittitur to be discussed at a conference with all parties present on May 27, 1986, at 10:00 am.